ARNOLDO CASILLAS, ESQ., SBN 158519
DANIEL W. GILLETTE, ESQ., SBN 244019
CASILLAS & ASSOCIATES
2801 E. Spring Street, Suite 200
Long Beach, CA 90806
Tel: (562) 203-3030
Fax: (323) 297-2833
Email: acasillas@casillaslegal.com

Attorneys for Plaintiff COREY WILLIAMS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COREY WILLIAMS, ) | **CASE NO.: 2:21-cv-08077 JAK (PLAx)** |
| Plaintiff, ) | |
| vs. ) | **FOURTH AMENDED COMPLAINT FOR DAMAGES** |
| RICARDO GARCIA, MARK RIDLEY-THOMAS; HILDA SOLIS; SHEILA KUEHL, LAW OFFICES OF THE LOS ANGELES COUNTY PUBLIC DEFENDER; COUNTY OF LOS ANGELES; RONALD BROWN; KELLY EMLING; LAURA GREEN, MICHAEL SUZUKI; JENNY BROWN; DANIEL KUPERBERG; RUBEN MARQUEZ; AND DOE DEFENDANTS 1 THROUGH 10, INCLUSIVE, ) | **CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. § 1983** |
| | **1. DELIBERATE INDIFFERENCE TO CONSTITUIONAL VIOLATIONS** |
| | **2. MUNICIPAL LIABILITY FOR CONSTITUIONAL VIOLATIONS** |
| Defendants. ) | **DEMAND FOR JURY TRIAL** |

////

////

1

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES

COMES NOW plaintiff COREY WILLIAMS, and alleges as follows:

### I.

### INTRODUCTION

1.      The present case presents the most glaring example, to date, of the complete dereliction of duty by the attorneys of the Los Angeles County Public Defender's Office.  Here, despite the trial court's urging the PD's office to file a motion to dismiss Mr. Williams' SVP case because of the PD's office failure to prosecute the case, the PD's office refused to recognize their conflict of interest and refused to file the motion.  An established practice and custom in the PD's office to not file motions against themselves, prevented the prompt dismissal of this case for the violation of Mr. William's constitutional rights.

2.      Instead, the deputy public defender at the time admitted on the record that her office was preventing her from filing the motion that the court suggested. Ultimately, from 2008 until 2018, the PD's office allowed the prosecution to improperly and illegally use Mr. Williams' juvenile records to support the SVP allegations against Mr. Williams.   The astonishing failure of the PD's office to meaningfully investigate Mr. Williams' case and to zealously defend him caused him to be unconstitutionally held in custody from 2008 until 2021 without a trial.

3.      In 2005, Michael Judge, then the Public Defender for Los Angeles County, served as the Chair of a ten-member Working Group that was appointed by the State Bar Board of Governors in May 2004 and that was tasked with the revision of The State Bar of California Guidelines for the delivery of indigent defense services.  In 2006, Michael Judge's work resulted in revisions to the State Bar's guidelines for the provision of indigent legal defense services.  Shortly thereafter, Corey Williams, in 2008, had become a client of the Los Angeles County Public Defender's Office as a detainee pending civil commitment.  Regretfully, the administrators of the Los Angeles County Public Defender's Office ignored these important guidelines that were intended to ensure that their clients' constitutional

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

rights were protected.  As a result of this failure, Corey Williams spent more than 13 years in civil detention because the Public Defender's Office abandoned him and did not get his case to trial.  Because of this great delay and the institutional failures of the Public Defender's Office, Mr. Williams's constitutional rights to a speedy trial were violated.

4.     The State Bar of California Guidelines for Indigent Defense Services Delivery System warn that excessive attorney workloads can compromise the ability of the public defender attorneys to render competent and quality representation in a timely manner.  The guidelines warn that number and type of cases for which an attorney is responsible may impact the quality of representation individual clients receive.   For that reason, the guidelines state that no attorney should be assigned more cases than he or she can effectively handle. The guidelines require that appropriate records should be kept by the administrators of the public defender offices to avoid assigning an excessive number of cases to an attorney.  Further, the guidelines state that the public defender administrators bear the ultimate responsibility for assuring that workloads are not excessive in volume for any attorney to whom cases are assigned.   According to the guidelines, failure of a public defender administrator to effectively address the effects of workloads can result in personal civil liability and could put his or her license to practice law in jeopardy.

5.     The guidelines that Michael Judge and his working group developed state that should a public defender administrator determine that the current and incoming workload exceeds the capacity of the organization to provide necessary and competent representation, it is incumbent upon these administrators to secure the additional resources necessary or to decline to accept new cases to the extent that they exceed the capacity of the defense delivery system.

6.     Sadly, the guidelines that Michael Judge and the State Bar working group developed and implemented were ignored by the present defendants all to the great detriment of the present Plaintiff, Corey Williams and his constitutional rights.

3

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

By 2006, the Public Defender's Office was so backlogged with work that the office declared itself unavailable to process any civil commitment cases and turned over the majority of their civil commitment cases to the superior court. Despite the great workload, the administrators of the Public Defender's Office agreed in 2007 to be reinstated as counsel for these former clients. This overwhelmed the office and civil commitment cases were again abandoned, and new cases that should never have been accepted, such as Mr. Williams, were also abandoned.

7.     Mr. Williams's case is replete with examples of the attorneys from the Los Angeles County Public Defenders' Office beseeching their supervisors, the administrators of this office and the Los Angeles County Board of Supervisors, for help to ameliorate the great negative impact of the overwhelming workload. These same attorneys warned the administrators and the Board of Supervisors repeatedly of the violations of the civil rights of the persons being represented by the PD's Office, including Mr. Corey Williams, and of the impending related civil liability related to the civil rights violations.   The letters and memoranda starkly stated that the workload was so great that they were no longer "competent" to represent Mr. Williams.   The attorneys handling Mr. Williams's case simply could not get his case to trial because of the customs and practices that were in place at the PD's Office and because of the failures of their supervisors and administrators in addressing their case load. Despite this, the present administrator defendants and those defendants from the Los Angeles County Board of Supervisors refused to take even modest measures to protect Mr. Williams's constitutional rights to due process and a speedy trial. They consciously allowed him to remain in civil detention for more than 13 years.

## II.

## SUMMARY OF CASE

8.     Plaintiff Corey Williams (hereafter also "Mr. Williams") was held in custody in a psychiatric hospital for more than 13 years awaiting trial.   The

4

extraordinary length of this delay resulted from a systemic breakdown in the Los Angeles County public defender system.  This breakdown forced Mr. Williams to choose between having prepared counsel and a timely trial. Under the Constitution, he had a right to both.  He got neither.

9.     The constitutional violations suffered by Mr. Williams in being denied a speedy trial and due process resulted from the deliberate indifference to his constitutional rights by the present defendants who were all aware of his long unconstitutional detention and acquiesced in the violation of Mr. Williams's civil rights.

10.     The purpose of the present action is to bring to light the complete failure of the Public Defender's office and the County of Los Angeles to carry out their statutory and ethical duties to their clients, and the failure of the individually named defendants to ensure that Mr. Williams was receiving constitutionally adequate service.

11.     Further, in keeping with one of the goals of 42 U.S.C. Section 1983, the purpose of the of this action is also to make examples of the individual defendants so as to ensure that other similarly-situated public officials honor their promise to protect and defend the constitution of the United States.

### III.

### JURISDICTION AND VENUE

12.     This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendment of the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## IV.

## PARTIES

### Plaintiff

14.     At all times relevant hereto, Plaintiff Corey Williams (hereafter also "Mr. Williams" and "Plaintiff") is and was a resident of the County of Los Angeles, California.

### Administrators and Managers of the Law Offices of the Los Angeles County Public Defender

15.     Defendants  RICARDO GARCIA, RONALD BROWN, KELLY EMLING, LAURA GREEN, MICHAEL SUZUKI, JENNY BROWN, DANIEL KUPERBERG and RUBEN MARQUEZ are referred to here collectively as "Administrative Defendants."

16.     Defendant Ricardo Garcia

a.     At all times relevant hereto defendant Ricardo Garcia was a resident of the County of Los Angeles.  Ricardo Garcia was appointed public defender of the County of Los Angeles in October 2018.  During the appointment process, he learned of the significant problem that the Public Defender's Office had with its SVP Unit and the unit's inability to get a large number of SVP cases to trial.  During his research and discussions with staff from the Public Defender's Office, he learned of the dismissal of two SVP matters, *People v. Zavala*, and *People v. Vasquez* because of the systemic failure of the Public Defender's Office in getting SVP cases to trial.  Shortly before his appointment, the decision in *People v. Superior Court* (*Vasquez*), (2018) 27 Cal.App.5th 36 was published.  The opinion was critical of the Public Defender's Office and emphasized the systemic failures which existed at the Public Defender's Office (serial substitution of attorneys, inordinate delays in

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

getting cases to trial, failure to communicate with clients, failure to arrange for experts, etc.).  The opinion established a significant legal precedent which amplified the rights of SVP clients to a speedy trial. The opinion was a great embarrassment to the Public Defender's Office

b.   After the Vasquez opinion was published, Ricardo Garcia confirmed the truth of the allegations through conversations and other communications with his staff, including the other Administrative Defendants, and he was made aware of a large number of cases SVP cases, including Mr. Williams' case, which had been lingering without trial for extended periods of time – exceeding five years.   He became personally aware of the facts and circumstances of Mr. Williams' case, his repeated requests to go to trial, his repeated requests to have the Public Defender's Office removed as his counsel, and of the conflict of interest that existed between Mr. Williams' and the Public Defender's Office.

c.   As the Public Defender, he was vested by law with the responsibility of representing indigent defendants in Los Angeles County at all stages of the criminal proceedings and in all stages of civil detention proceedings related to indigent persons detained pursuant to California *Welfare and Institutions Code*, section 6600, et seq.

d.   The present defendant did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Williams. Liability against this defendant is based on this defendant's role as administrator of the Law Offices of the Los Angeles County Public Defender (hereafter also "PD's Office") and its SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional

7

customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

e.   With respect to all conduct alleged herein, defendant Ricardo Garcia acted under the color of law and in the course and scope of his employment with the County of Los Angeles.  During all said time, he was also a high-ranking administrator and policy maker for the for the PD's Office.

f.   At all times relevant hereto and as the Public Defender for Los Angeles County, and before that as Assistant Public Defender, defendant Ricardo Garcia was an administrator and supervisor with the authority to:

   i.   develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender;

   ii.   develop and implement specific training programs for public defender personnel, including deputy public defenders,

   iii.   secure budget allocations for the funding for specific units, personnel needs and cases within his office;

   iv.   declare in any case being handled by his office that the public defender's office is "unavailable" and thereby have a court assign the case to another public defender agency (Los Angeles County Alternate Public Defender) or to a private panel attorney for handling;

   v.   declare conflicts of interest; and,

   vi.   order or otherwise undertake all necessary measures to ensure that any case handled by the public defender's office would be brought to trial in a timely manner.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

g.  Defendant Ricardo Garcia monitored the civil detention proceedings of Mr. Williams from the time he was appointed as Public Defender until the Public Defender's Office declared a conflict.  Defendant Ricardo Garcia had specific knowledge Mr. Williams's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to his prolonged unconstitutional detention and the resulting violation of Mr. Williams's civil rights.

h.  Defendant Ricardo Garcia is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the administration of the PD's Office and its SVP unit and in the training, supervision and/or control of his subordinates.  He is also sued in his personal capacity for his acquiescence and ratification under color of law in the constitutional deprivations which this complaint alleges and for the conduct that showed a reckless or callous indifference to the rights of the present plaintiff.  Defendant Ricardo Garcia's affirmative conduct, as described herein below, also involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

17.  Defendant Ronald Brown:

a.  At all times relevant hereto defendant Ronald Brown was a resident of the County of Los Angeles.  Ronald Brown was appointed public defender of the County of Los Angeles in 2011 and served as the public defender for Los Angeles County until 2016.  Prior to that, he served as Assistant Public Defender from 2006 to 2011. During that time, he also held supervisorial and administrative positions.  As the Public Defender,

9

he was vested by law with the responsibility of representing indigent defendants in Los Angeles County at all stages of the criminal proceedings and in all stages of civil detention proceedings related to indigent persons detained pursuant to California *Welfare and Institutions Code*, section 6600, et seq.

b.  As early as 2006, when defendant Ronald Brown began serving as Assistant Public Defender, he was informed of the present plaintiff's pending SVP proceedings and he monitored Mr. Williams's case until defendant Brown retired in 2016.  The present defendant did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Williams. Liability against this defendant is based on this defendant's role as administrator of the Law Offices of the Los Angeles County Public Defender (hereafter also "PD's Office") and its SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

c.  With respect to all conduct alleged herein, defendant Ronald Brown acted under the color of law and in the course and scope of his employment with the County of Los Angeles.  During all said time, he was also a high-ranking administrator and policy maker for the for the PD's Office.

d.  At all times relevant hereto and as the Public Defender for Los Angeles County, and before that as Assistant Public Defender, defendant Ronald Brown was an administrator and supervisor with the authority to:

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

i.   develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender;

ii.  develop and implement specific training programs for public defender personnel, including deputy public defenders,

iii. secure budget allocations for the funding for specific units, personnel needs and cases within his office;

iv.  declare in any case being handled by his office that the public defender's office is "unavailable" and thereby have a court assign the case to another public defender agency (Los Angeles County Alternate Public Defender) or to a private panel attorney for handling;

v.   declare conflicts of interest; and,

vi.  order or otherwise undertake all necessary measures to ensure that any case handled by the public defender's office would be brought to trial in a timely manner.

e.   Defendant Ronald Brown monitored the civil detention proceedings of Mr. Williams between 2008 and 2016.  Defendant Brown had specific knowledge Mr. Williams's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to his prolonged unconstitutional detention and the resulting violation of Mr. Williams's civil rights.

f.   Defendant Brown is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the administration of the PD's Office and its SVP unit and in the training, supervision and/or control of his subordinates.  He is also sued in his personal capacity for his

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

acquiescence and ratification under color of law in the constitutional deprivations which this complaint alleges and for the conduct that showed a reckless or callous indifference to the rights of the present plaintiff.  Defendant Brown's affirmative conduct, as described herein below, also involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

18.   Defendant Kelly Emling:

a.   At all times relevant hereto defendant Kelly Emling was a resident of the County of Los Angeles, and, as relevant here, served as an administrator within The Law Offices of the Los Angeles County Public Defender. She had the responsibility of supervising and administering the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California *Welfare and Institutions Code*, section 6600, et seq., including SVP detainees awaiting trial. With respect to all conduct alleged herein, defendant Emling acted under the color of law and in the course and scope of her employment with the County of Los Angeles as an administrator of the SVP Unit.  As an administrator within the PD's office, defendant Emling was also an administrator and supervisor with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender;

b.   Defendant Emling did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

within the scope of legal representation of Mr. Williams. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

c.   Defendant Emling is sued in her personal capacity as supervisor and administrator for her own culpable action or inaction with respect to the present plaintiff, and in the administration and supervision of the SVP Unit and in the training, supervision and/or control of her subordinates as well as for her indifference as well as for her indifference to the constitutional violations which resulted from her supervision of and administration of the SVP Unit.  She is also sued in her personal capacity for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by her that showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

19.   Defendant Michael Suzuki:

a.   At all times relevant hereto defendant Michael Suzuki was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Suzuki acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.    As a Division Chief and/or as a supervisor in the PD's Office and its SUV unit, defendant Suzuki was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.    Liability against defendant Suzuki is based only on this defendant's role as administrator of the PD's office and the SVP unit, but also this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.    After his promotion to supervisor/administrator within the PD's Office, Mr. Suzuki monitored the SVP Unit's civil detention proceedings, including those of Mr. Williams.  As a result, defendant Suzuki had specific knowledge regarding the civil detention proceedings for Mr. Williams and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Williams's civil rights which resulted from his long and unconstitutional detention.

e.    Defendant Suzuki is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the training, supervision and/or control of his subordinates as well as for his indifference to the constitutional

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

violations which resulted from his supervision of and administration of the SVP Unit.  He is also sued in his personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by him that showed a reckless or callous indifference to this Plaintiff's rights.  This defendant's affirmative conduct, as described herein below, involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present.

20.     Defendant Jenny Brown:

a.     At all times relevant hereto defendant Jenny Brown was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender. She had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from her work as an administrator and supervisor of the SVP Unit, defendant Jenny Brown acted under the color of law and in the course and scope of her employment with the County of Los Angeles.

b.     As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Jenny Brown was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.   Defendant Jenny Brown did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Williams. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.   After her promotion to supervisor/administrator, defendant Jenny Brown monitored the SVP Unit's civil detention proceedings, including those of Mr. Williams.  As a result, defendant Jenny Brown had specific knowledge regarding the civil detention proceedings of Mr. Williams and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Williams's civil rights which resulted from his long and unconstitutional detention.

e.   Defendant Jenny Brown is sued in her personal capacity as a supervisor and administrator for her own culpable action or inaction with respect to the present plaintiff, and in the training, supervision and/or control of her subordinates as well as for her indifference to the constitutional violations which resulted from her supervision of and administration of the SVP Unit.  She is also sued in her personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by her that showed a reckless or callous indifference to the violation of constitutional rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

21.    Defendant Daniel Kuperberg:

a.    At all times relevant hereto defendant Daniel Kuperberg was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Kuperberg acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.    As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Kuperberg was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.    Defendant Kuperberg did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Williams. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's ratification of, and acquiescence in, and ratification of, the

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  unconstitutional customs and practices which resulted in the present

2  plaintiff's harm and damages as alleged herein.

3    d.    After his promotion to supervisor/administrator, defendant Kuperberg

4  monitored the SVP Unit's civil detention proceedings, including those of

5  Corey Williams.  As a result, defendant Kuperberg had specific

6  knowledge regarding the civil detention proceedings for plaintiff Corey

7  Williams and, as spelled out herein below, was deliberately indifferent to

8  the violation of Mr. Williams's civil rights which resulted from his long

9  and unconstitutional detention.

10    e.    Defendant Kuperberg is sued in his personal capacity as supervisor and

11  administrator for his own culpable action or inaction with respect to the

12  present plaintiff, and in the training, supervision and/or control of his

13  subordinates as well as for his indifference to the constitutional

14  violations which resulted from his supervision of and administration of

15  the SVP Unit.  He is also sued in his personal capacity for his

16  acquiescence in, and ratification of, the constitutional deprivations which

17  this complaint alleges and for the conduct carried out by him that

18  showed a reckless or callous indifference to the rights of the present

19  plaintiff.  This defendant's affirmative conduct, as described herein

20  below, involves his acquiescence to, and ratification of, specific

21  customs, practices and policies and procedures carried out by his

22  subordinates which this defendant knew, or should have known, would

23  inflict a constitutional violation upon the present plaintiff.

24  22.    Defendant Ruben Marquez:

25    a.    At all times relevant hereto defendant Ruben Marquez was a resident of

26  the County of Los Angeles, and, as relevant here, served as administrator

27  within The Law Offices of the Los Angeles County Public Defender.  He

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Marquez acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.   As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Marquez was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.   Defendant Marquez did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. Williams.  Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.   After his promotion to supervisor/administrator, defendant Marquez monitored the SVP Unit's civil detention proceedings, including those of Corey Williams.  As a result, defendant Marquez had specific knowledge regarding the civil detention proceedings for plaintiff Corey Williams and, as spelled out herein below, was deliberately indifferent to

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    the violation of Mr. Williams's civil rights which resulted from his long

2    and unconstitutional detention.

3    e.    Defendant Marquez is sued in his personal capacity as a supervisor and

4    administrator for his own culpable action or inaction with respect to the

5    present plaintiff, and in the training, supervision and/or control of his

6    subordinates as well as for his indifference to the constitutional

7    violations which resulted from his supervision of and administration of

8    the SVP Unit.  He is also sued in his personal capacity for his

9    acquiescence in, and ratification of, the constitutional deprivations which

10   this complaint alleges and for the conduct carried out by him that

11   showed a reckless or callous indifference to the rights of the present

12   plaintiff.  This defendant's affirmative conduct, as described herein

13   below, involves his acquiescence to, and ratification of, specific

14   customs, practices and policies and procedures carried out by his

15   subordinates which this defendant knew, or should have known, would

16   inflict a constitutional violation upon the present plaintiff.

17   **Board of Supervisor Defendants**

18   23.    Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl

19   (hereafter also "BOS Defendants") were members of the Los Angeles County Board

20   of Supervisors from 2014 up to and beyond August 16, 2021.

21   24.    As presented in the Los Angeles County Charter, the members of the

22   Board of Supervisors serve in an executive capacity with respect to the various

23   departments that the Board oversees.  In this executive capacity, the Board of

24   Supervisors is required to administer all local governmental services.  Indigent legal

25   services, as provided by the Public Defender's Office, is one of the local government

26   services that the BOS defendants administered and managed as part of their executive

27   function.

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

25.     In keeping with this executive function, the BOS defendants served as administrators and supervisors of the Public Defender's Office.  They communicated regularly with the Administrative Defendants and with the employees of the SVP unit.  The BOS defendants made management and supervisorial decisions as to the administration of the SVP unit.

26.     As presented below, and per the Los Angeles County Charter, as well as these defendants' personal custom and practice, each one of these defendants were responsible for the management, supervision and administration of the Law Offices of the Los Angeles Public Defender.

27.     During their individual tenure, each of the BOS Defendants learned of the problem with getting SVP cases to trial.   They were presented with data of each of the SVP cases, including Mr. Williams's SVP case, of the prolonged unconstitutional detention of the various SVP clients, and - through letters and memoranda from individual deputy public defenders at the SVP Unit - of the inability and failure of the PD's Office to timely bring the SVP cases, including Mr. Williams's case, to trial.

28.     In making decision about the administration and management of the Public Defender's office and its SVP unit, these defendants participated in and made management and administrative decisions that effected the entire SVP case-load being handled by the Public Defender's Office.   Like the Administrative Defendants, the BOS defendants were not involved in the day-to-day decision-making for each individual case but, rather, made and joined in decisions about the administration and management of the SVP unit.  None of the decisions that the BOS defendants made or joined in on with respect to the management of the SVP unit were presented to the Board of Supervisors for consideration or approval or were otherwise part of their legislative function.  As the LA County Charter points out, permits and allows, the BOS defendants were called upon to supervise the departments that they oversaw.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

29.     Ultimately, despite repeated entreaties and warnings from the attorney staff of the PD's office, the BOS Defendants failed to take any action to address the violation of the SVP clients' rights to due process and a speedy trial, including those of Mr. Williams.

30.     For example, the BOS Defendants each knew, as early as September of 2014, that Mr. Williams would be held indefinitely in civil detention without trial unless they took action on his behalf.  Despite having the ability to do so, they refused to address the ongoing violation of his, or the other SVP detainee-clients', constitutional rights. The letters and memoranda they each received from the deputy public defenders in the SVP unit informed these defendants that the attorneys were unable to process the SVP cases, including Mr. Williams' case, and the attorneys also warned these defendants of the civil liability that would result should these defendants not act to correct the failures in the handling of the SVP cases, including the failure to timely bring Mr. Williams' case to trial.

31.     Despite this knowledge, each of the BOS Defendants refused to take any action to ensure that the SVP cases, including Mr. Williams' case, were brought to trial in a timely fashion.  As a result, his constitutional rights to due process and a speedy trial were violated as spelled out herein.

32.     Defendant Mark Ridley-Thomas

a.     At all times relevant hereto, the present defendant was a resident of the County of Los Angeles.  He was a member of the Board of Supervisors of Los Angeles County from 2008-2020.  As part of his duties as a member of the Los Angeles County Board of Supervisors, he was assigned with the administrative responsibility of directly overseeing, managing, directing and/or controlling defendant Law Offices of the Los Angeles County Public Defender.  With respect to his oversight, management and supervision of the Law Offices of the Los Angeles

22

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

County Public Defender, the present defendant did not have to seek authorization from the Board of Supervisors for his decisions, none of such decisions were required to be put before the Board of Supervisors for approval in the form of resolutions, policy determinations or other legislative acts.   The acts and omissions of this defendant, as alleged herein, were made in this defendant's executive capacity, consistent with this defendant's duties to manage and administer the county department known as The Office of the Public Defender, including the making of decision which impacted and governed how the SVP Unit would be administered and how categories of cases, including older SVP cases – cases pending trial for longer than 6 years, including Mr. Williams' case, would be managed.

b.   With respect to all conduct alleged herein, this defendant acted under the color of law.

c.   Per this defendant's responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, the present defendant had the authority to:

  i.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

  ii.   develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

  iii.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

iv.  instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.  This defendant oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out his oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, this defendant had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases. The PD's office often declared "unavailability" in non-SVP cases with the consent of Mark Ridley-Thomas.

e.  These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. Williams's case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.

f.  Defendant Mark Ridley-Thomas requested and received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

regarding the management and operation of the SVP Unit, including the status of Mr. Williams's civil detention proceedings. Defendant Ridley-Thomas had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Williams's civil rights.   Defendant Mark Ridley-Thomas was aware of the present plaintiff's SVP case, the long delay in getting his case to trial, and the unconstitutional customs and practices which caused the delays in getting Plaintiff's case to trial.

g.   Defendant Mark Ridley-Thomas is sued in his personal capacity as a supervisor and administrator for his own culpable action or inaction related to the management of Mr. Williams's case, and for his specific conduct and deliberate indifference which resulted in the violation of the present Plaintiff's constitutional rights.  He is also sued in his personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for his conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves his acquiescence to, and ratification of specific conduct carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

h.   With respect to the individual cases handled by the PD's office, defendant Mark Ridley-Thomas often managed individual cases that were being handled by the PD's Office.  In his role as a supervisor and administrator of the Office of the Public Defender, he was allowed to, and did, deal with individual cases that were assigned to the PD's office.  This defendant would either request that the client's file be brought to

25

his office or inquire directly with Ronald Brown, or other supervisors in the PD's Office as to individual cases. He would instruct the Ronald Brown and his subordinates as to the management of the case, push for a particular outcome, and demand that the particular case be resolved in a particular way.   It was not uncommon, in fact, for employees of the Chief Executive Office to bring public defender files to the office of Mark Ridley Thomas at his request.  This included delivery of files by the County Executive Officer, William T. Fujioka, to this defendant's office.

i.   From 2006 on, this defendant learned of Mr. Williams's case during the various monthly meetings with Ronald Brown and the other administrators and supervisors of the PD's office. In the discussion of the operations of the SVP Unit, individual cases were presented to this defendant, including Mr. William's case.

j.   In 2006, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in 2006 a large backlog of cases and that the superior court as well as the District Attorney's Office became concerned that the SVP cases were not being processed.  New legislation came into effect which required that unadjudicated pending SVP cases be brought to trial within 24 months. At that point, this defendant, Ronald Brown and the PD's managers and administrators agreed that it was best to declare themselves "unavailable" and to request that the court appoint private counsel for Mr. Williams and other SVP clients.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Defendant Ridley-Thomas knew in 2006 that if private counsel was not appointed for Mr. Williams, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. Williams's case and new legislation required that those earlier cases be promptly tried.  This created a conflict of interest within the PD's Office; i.e., they were forced to decide which SVP client would get priority over other SVP clients and have their case brought to trial.   Recognizing this conflict of interest, this defendant, Ronald Brown and the PD's managers and administrators agreed that they would declare the PD's Office unavailable as to these cases and have the court appoint private counsel.

k.    In 2007, it became apparent to defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office that this plan would not be successful.  The court informed them that there was not an adequate amount of willing and qualified private attorneys to assume the management of the SVP cases.  As such, those cases which were to be transferred out of the SVP unit to private counsel to relieve the workload would remain in the SVP unit.  As such, this defendant knew that the overworked attorneys and staff in the SVP unit would continue to be overwhelmed with the high volume of cases and that the long-expected delays in the bringing of the cases to trial would persist, including the delay in the processing of Mr. Williams's case.

l.    In 2007, through the implementation of a memorandum of understanding between the PD's Office, the Superior Court and the Office of the District attorney it was agreed that these cases would remain in the SVP Unit. By the SVP cases remaining in the PD's office, it was expected by PD's Office, the Superior Court and the District Attorney's Office that

27

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

said SVP clients would have competent counsel going forward, and that all SVP cases that were taken on by the office, such as Mr. Williams, would also have competent counsel moving forward.    To guarantee that competent counsel was provided to Mr. Williams and the other SVP clients, the County of Los Angeles agreed to provide the PD's Office additional resources to increase the attorney and staff levels so as to "ensure that these SVP clients would have competent representation and that they would not be deprived of due process because of lack of County, attorney and judicial resources".  The County of Los Angeles provided the additional resources to the PD's Office in 2008 when Mr. Williams' case was assigned to the PD's Office. Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office, however, did not apply these resources to the SVP unit. Nothing changed in the SVP Unit, accordingly.  Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office knew if they did not apply the additional resources to the SVP Unit, that overwhelming workload would persist within the unit, and that the SVP clients, including Mr. Williams, would continue to be denied their due process rights and their speedy trial rights.  Despite this, Defendant Ridley-Thomas allowed the resources to be used for other purposes by the PD's Office and allowed the overwhelmed environment to persist in the SVP Unit.   The above agreements and history are memorialized, in part, in the Memorandum of Understanding which is attached hereto as Exhibit 1.[1]

---

[1] Defendant Michael Suzuki was the representative from the PD's Office who signed the MOU on behalf of the PD's Office, and he participated in the formulation, adoption and implementation of this MOU.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

m.   Beginning in 2006, and throughout the eight following years, defendant Ridley-Thomas, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office.  During many of these meetings after 2008, they discussed Mr. Williams's case.   Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year.  They accepted that the SVP clients would not be getting a speedy trial.  They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed.  In discussing Mr. Williams's case, they all agreed that the SVP petition filed against him made him even less likely to protest the denial of his rights.

n.   From 2006 until 2014, less than four SVP cases were brought to trial annually by the attorneys in the SVP Unit.  Mr. Williams's SVP case was six years old in 2014 and he had been waiting for his trial six years in custody.  During each of those years, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the status of his case, acknowledged that it was not moving to trial in a timely manner, and agreed that they would not declare "unavailability" in Mr. Williams's case so as to ensure that he would be assigned to private counsel to move his case to trial promptly.

o.   In 2014, defendant Ridley-Thomas learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent.  Defendant Ridley-Thomas learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would

29

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  cause the already-existing delay in the processing of cases to trial to be

2  drastically exacerbated.  In discussing the staff reduction, defendant

3  Ridley-Thomas learned that Mr. Williams's case would be further

4  delayed.  He and Ronald Brown and the other managers and

5  administrators of the PD's Office acknowledged that the staff reduction

6  would cause Mr. Williams to remain in custody for an indefinite amount

7  of time because the staff reduction would essentially put a stop to the

8  processing of cases by the SVP staff because they simply had too many

9  cases to effectively handle.

10  p.  During the time that the SVP staff reduction was being contemplated

11  during January through April of 2014, this defendant received letters and

12  memoranda from the attorneys and staff in the SVP Unit which informed

13  this defendant that the proposed staff reductions would make them

14  ineffective under law in their ability to assist their SVP clients.  The

15  letters and memoranda, all of which were hand-delivered to this

16  defendant, informed this defendant that the reduction in staff would

17  cause the further delay in the already unconscionably and

18  unconstitutionally slow processing of the SVP cases.  The letters and

19  memoranda expressly informed this defendant that the staff reductions

20  would cause the violation of the due process rights and speedy trial

21  rights of the SVP clients.   During the regular monthly discussions about

22  the administration of the PD's Office and the management of the case

23  load, this defendant was informed of the ages of the various SVP cases

24  and he learned that Mr. Williams's case was already at least six years

25  old, and that the staff reductions in the SVP unit would cause Mr.

26  Williams's case to remain in limbo, without trial, for an indefinite period

27  of time thereafter.

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

q.   In the discussion of the impact of the staff reductions during March and April of 2014, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of PD's Office declaring "unavailability" in Mr. Williams's case.  This would have ensured that his case would have gotten to trial in speedy fashion after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided that the PD's Office would not declare a conflict in Mr. Williams's case, thereby essentially abandoning Mr. Williams's case to an indefinite state of delay.

r.   During the discussion of the issuance of a declaration of unavailability in the SVP cases, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with Mr. Williams because his case was now inordinately old – 6 years, and that the delay in bringing his case to trial was due to their chronic mismanagement of the SVP Unit, including the breached agreement/MOU of 2007.  Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in the older SVP cases, like the present Plaintiff's case, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain Mr. Williams's case within the SVP Unit so as to conceal their conflict of interest and avoid civil liability.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

33.    Defendant Hilda Solis:

a.    At all times relevant hereto, the present defendant, Hilda Solis, was a resident of the County of Los Angeles.  She was a member of the Board of Supervisors of Los Angeles County from 2008-2020.  As part of her duties as a member of the Los Angeles County Board of Supervisors, she was assigned with the administrative responsibility of directly overseeing, managing, directing and/or controlling defendant Law Offices of the Los Angeles County Public Defender.  With respect to her oversight, management and supervision of the Law Offices of the Los Angeles County Public Defender, the present defendant did not have to seek authorization from the Board of Supervisors for her decisions, none of such decisions were required to be put before the Board of Supervisors for approval in the form of resolutions, policy determinations or other legislative acts.   The acts and omissions of this defendant, as alleged herein, were made in this defendant's executive capacity, consistent with this defendant's duties to manage and administer the county department known as The Office of the Public Defender, including the making of decision which impacted and governed how the SVP Unit would be administered and how categories of cases, including older SVP cases – cases pending trial for longer than 6 years, including Mr. Williams' case, would be managed.

b.    With respect to all conduct alleged herein, defendant Hilda Solis acted under the color of law.

c.    Per her responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Hilda Solis had the authority to:

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

i.  instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

ii.  develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

iii. instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

iv.  instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.  In keeping with her executive responsibilities as a member of the board of supervisors, defendant Hilda Solis oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out her oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Hilda Solis had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare

33

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    unavailability" in specific SVP cases.  The PD's office often declared

2    "unavailability" in non-SVP cases with the consent of defendant Hilda

3    Solis.

4    e.    These regular meetings included discussions of the SVP Unit, its case

5         load, individual cases handled by said unit - including Mr. Williams's

6         case, the backlog of work in the unit, the understaffing of that unit, and

7         the extended time periods that SVP Unit clients were being detained.

8    f.    Defendant Hilda Solis requested and received regular memoranda,

9         emails, reports, budget requests, and other written correspondence and

10        documents from defendants Ronald Brown, Kelly Emling, Laura Green,

11        Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez

12        and other members of the Public Defender's Office regarding the

13        management and operation of the SVP Unit, including the status of the

14        various pending SVP cases and the civil detention proceedings related to

15        them, including the present Plaintiff's case.  Defendant Hilda Solis had

16        specific knowledge regarding Plaintiff's civil detention proceedings and,

17        as spelled out herein below, was deliberately indifferent to the violation

18        of Mr. Williams's civil rights.   Defendant Hilda Solis was aware of the

19        present plaintiff's SVP case, the long delay in getting his case to trial,

20        and the unconstitutional customs and practices which caused the delays

21        in getting Plaintiff's case to trial.

22    g.    Defendant Hilda Solis is sued in her personal capacity as a supervisor

23        and administrator for her own culpable action or inaction related to the

24        management of Mr. Williams's case, and for her specific conduct and

25        deliberate indifference which resulted in the violation of the present

26        Plaintiff's constitutional rights.  She is also sued in her personal capacity

27        for her acquiescence in, and ratification of, the constitutional

28

34

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

deprivations which this complaint alleges and for her conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of specific conduct carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

h.   With respect to the individual cases handled by the PD's office, defendant Hilda Solis often managed individual cases that were being handled by the PD's Office.  In her role as a supervisor and administrator of the Office of the Public Defender, she was allowed to, and did, deal with individual cases that were assigned to the PD's office. This defendant would either request that the client's file be brought to her office or inquire directly with Ronald Brown, or other supervisors in the PD's Office as to individual cases. She would instruct the Ronald Brown and her subordinates as to the management of the case, push for a particular outcome, and demand that the particular case be resolved in a particular way.

i.   In 2014, upon her taking office as a member of the Board of Supervisors and taking on her role as an administrator of the PD's Office, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in since 2006 a large backlog of cases in the SVP Unit of the PD's Office. This defendant was informed of the SVP cases that

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

had been awaiting trial the longest and she learned that among these cases, Mr. Williams's cae was one of the oldest pending cases.  She was informed that if private counsel was not appointed for Mr. Williams, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. Williams's case.

j.  Between 2014 and 2020, defendant Hilda Solis, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office.  During many of these meetings, they discussed the various long-pending SVP cases, including Mr. Williams's case.   Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year.  They accepted that the SVP clients would not be getting a speedy trial.  They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed.

k.  In 2014, defendant Hilda Solis learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent.  This concerned defendant Solis given that she had been just informed of the great delays in the bringing of the SVP cases to trial.  Defendant Ridley-Thomas Hilda Solis learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would cause the already-existing delay in the processing of cases to trial to be drastically exacerbated.  In discussing the staff reduction, defendant Hilda Solis learned that Mr. Williams's case, along with the other long-pending SVP

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

cases, would be further delayed.  She and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. Williams, and the other long-pending SVP clients, to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

l. During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients.  The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients.   During the regular monthly discussions about the management of the PD's Office and delays in getting SVP cases to trial, this defendant learned that Mr. Williams's case was already at least six years old in 2014 and that the staff reductions in the SVP unit would cause Mr. Williams's case to remain in limbo, without trial, for an indefinite period of time thereafter.

m. In the discussions of the impact of the staff reductions during March and April of 2014, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

PD's Office declaring "unavailability" in the SVP cases, including Mr. Williams's case.  This would have ensured that the older SVP cases, including Mr. Williams' case would have gotten to trial in speedy fashion after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided, or joined in the decision, that the PD's Office would not declare a conflict in any SVP case, including Mr. Williams's case, thereby essentially abandoning Mr. Williams's case to an indefinite state of delay.

n.    During the discussion of the issuance of a declaration of unavailability in Mr. Williams's case, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with their SVP clients, including Mr. Williams, because their cases were now inordinately old – 6 years in Mr. Williams case, with many older cases, and that the delay in bringing these older SVP cases to trial was due to their chronic mismanagement of the SVP Unit, including the breached agreement/MOU of 2007, which was explained to this defendant.  Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in the various older SVP cases, including Mr. Williams's case, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain the older SVP cases, including Mr. Williams's case, within the

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

SVP Unit so as to conceal their conflict of interest and avoid civil liability.

o.   In March and April of 2014, defendant Solis was further informed that the SVP Unit at the PD's Office was dramatically under understaffed, that the work load exceeded the attorneys' ability to effectively manage their cases, that SVP clients were being so neglected that their cases were being delayed to such an extent that the clients' constitutional rights were being violated, and that Mr. Williams's case was one of these neglected older cases.

34.   Defendant Sheila Kuehl:

a.   At all times relevant hereto, the present defendant, Sheila Kuehl, was a resident of the County of Los Angeles.  She was a member of the Board of Supervisors of Los Angeles County from 2008-2020.  As part of her duties as a member of the Los Angeles County Board of Supervisors, she was assigned with the administrative responsibility of directly overseeing, managing, directing and/or controlling defendant Law Offices of the Los Angeles County Public Defender.  With respect to her oversight, management and supervision of the Law Offices of the Los Angeles County Public Defender, the present defendant did not have to seek authorization from the Board of Supervisors for her decisions, none of such decisions were required to be put before the Board of Supervisors for approval in the form of resolutions, policy determinations or other legislative acts.   The acts and omissions of this defendant, as alleged herein, were made in this defendant's executive capacity, consistent with this defendant's duties to manage and administer the county department known as The Office of the Public Defender, including the making of decision which impacted and

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

governed how the SVP Unit would be administered and how categories of cases, including older SVP cases – cases pending trial for longer than 6 years, including Mr. Williams' case, would be managed.

b.  With respect to all conduct alleged herein, defendant Sheila Kuehl acted under the color of law.

c.  Per her responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Sheila Kuehl had the authority to:

   i.  instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

   ii.  develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

   iii.  instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

   iv.  instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.  In keeping with her executive responsibilities as a member of the board of supervisors, defendant Sheila Kuehl oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out her oversight of said office, he met monthly,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Sheila Kuehl had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with the consent of defendant Sheila Kuehl.

e.   These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. Williams's case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.

f.   Defendant Sheila Kuehl requested and received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office regarding the management and operation of the SVP Unit, including the status of the various pending SVP cases and the civil detention proceedings related to them, including the present Plaintiff's case.  Defendant Sheila Kuehl had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Williams's civil rights.   Defendant Sheila Kuehl was aware of the present plaintiff's SVP case, the long delay in getting his case to

41

1                 trial, and the unconstitutional customs and practices which caused the

2                 delays in getting Plaintiff's case to trial.

3     g.    Defendant Sheila Kuehl is sued in her personal capacity as a supervisor

4                 and administrator for her own culpable action or inaction related to the

5                 management of Mr. Williams's case, and for her specific conduct and

6                 deliberate indifference which resulted in the violation of the present

7                 Plaintiff's constitutional rights.  She is also sued in her personal capacity

8                 for her acquiescence in, and ratification of, the constitutional

9                 deprivations which this complaint alleges and for her conduct which

10                showed a reckless or callous indifference to the rights of the present

11                plaintiff.  This defendant's affirmative conduct, as described herein

12                below, involves her acquiescence to, and ratification of specific conduct

13                carried out by her subordinates which this defendant knew, or should

14                have known, would inflict a constitutional violation upon the present

15                plaintiff.

16     h.    With respect to the individual cases handled by the PD's office,

17                defendant Sheila Kuehl often managed individual cases that were being

18                handled by the PD's Office.  In her role as a supervisor and

19                administrator of the Office of the Public Defender, she was allowed to,

20                and did, deal with individual cases that were assigned to the PD's office.

21                This defendant would either request that the client's file be brought to

22                her office or inquire directly with Ronald Brown, or other supervisors in

23                the PD's Office as to individual cases. She would instruct the Ronald

24                Brown and her subordinates as to the management of the case, push for a

25                particular outcome, and demand that the particular case be resolved in a

26                particular way.

27

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

i.     In 2014, upon her taking office as a member of the Board of Supervisors and taking on her role as an administrator of the PD's Office, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in since 2006 a large backlog of cases in the SVP Unit of the PD's Office. This defendant was informed of the SVP cases that had been awaiting trial the longest and she learned that among these cases, Mr. Williams's cae was one of the oldest pending cases.  She was informed that if private counsel was not appointed for Mr. Williams, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. Williams's case.

j.     Between 2014 and 2020, defendant Sheila Kuehl, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office.  During many of these meetings, they discussed the various long-pending SVP cases, including Mr. Williams's case.   Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year.  They accepted that the SVP clients would not be getting a speedy trial.  They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed.

43

k.    In 2014, defendant Sheila Kuehl learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent.  This concerned defendant Sheila Kuehl given that she had been just informed of the great delays in the bringing of the SVP cases to trial.  Defendant Sheila Kuehl learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would cause the already-existing delay in the processing of cases to trial to be drastically exacerbated.  In discussing the staff reduction, defendant Sheila Kuehl learned that Mr. Williams's case, along with the other long-pending SVP cases, would be further delayed.  She and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. Williams, and the other long-pending SVP clients, to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

l.    During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients.  The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial

1    rights of the SVP clients.   During the regular monthly discussions about

2    the management of the PD's Office and delays in getting SVP cases to

3    trial, this defendant learned that Mr. Williams's case was already at least

4    six years old in 2014 and that the staff reductions in the SVP unit would

5    cause Mr. Williams's case to remain in limbo, without trial, for an

6    indefinite period of time thereafter.

7    m.    In the discussions of the impact of the staff reductions during March and

8          April of 2014, defendant Sheila Kuehl, Ronald Brown and the other

9          managers and administrators of the PD's Office discussed the option of

10         PD's Office declaring "unavailability" in the SVP cases, including Mr.

11         Williams's case.  This would have ensured that the older SVP cases,

12         including Mr. Williams' case would have gotten to trial in speedy

13         fashion after being transferred to private counsel.   This option was

14         viable, but because of a conflict of interest, this defendant decided, or

15         joined in the decision, that the PD's Office would not declare a conflict

16         in any SVP case, including Mr. Williams's case, thereby essentially

17         abandoning Mr. Williams's case to an indefinite state of delay.

18   n.    During the discussion of the issuance of a declaration of unavailability in

19         Mr. Williams's case, defendant Sheila Kuehl, Ronald Brown and the

20         other managers and administrators of the PD's Office discussed the

21         implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it

22         was held that a delay as short as 11 months in the bringing of an SVP

23         case to trial could constitute a violation of due process rights and speedy

24         trial rights.   During their discussions in March and April of 2014, these

25         defendants acknowledged that they were now in a conflict of interest

26         with their SVP clients, including Mr. Williams, because their cases were

27         now inordinately old – 6 years in Mr. Williams case, with many older

28

45

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

cases, and that the delay in bringing these older SVP cases to trial was due to their chronic mismanagement of the SVP Unit, including the breached agreement/MOU of 2007, which was explained to this defendant.  Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in the various older SVP cases, including Mr. Williams's case, defendant Sheila Kuehl, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain the older SVP cases, including Mr. Williams's case, within the SVP Unit so as to conceal their conflict of interest and avoid civil liability.

o.   In March and April of 2014, defendant Sheila Kuehl was further informed that the SVP Unit at the PD's Office was dramatically under understaffed, that the work load exceeded the attorneys' ability to effectively manage their cases, that SVP clients were being so neglected that their cases were being delayed to such an extent that the clients' constitutional rights were being violated, and that Mr. Williams's case was one of these neglected older cases.

**Public Entity Defendants**

35.   Defendant County of Los Angeles:  At all times mentioned herein, defendant County of Los Angeles was a public entity duly organized and existing under and by virtue of the laws of the state of California, with the capacity to sue and be sued.  Defendant County of Los Angeles is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents, departments, subdivisions and agencies.  Defendant County of Los Angeles operates, manages, directs and/or controls defendant Law offices of the Los Angeles County Public Defender which is also a separate public entity. At all times relevant to the facts alleged herein, Defendant County of Los Angeles was responsible for assuring that

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

the actions, omissions, policies, procedures, practices and customs of its departments, subdivisions, and employees, complied with Constitution of the United States.

36.     Defendant Law office of the Los Angeles County Public Defender: At all times mentioned herein, defendant Law offices of the Los Angeles County Public Defender was a public entity, and subdivision of the County of Los Angeles, duly organized and existing under and by virtue of the laws of the state of California and the Charter of the County of Los Angeles, with the capacity to sue and be sued. Defendant Law Offices of the Los Angeles County Public Defender is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents, departments, subdivisions and Units, including its SVP Unit. According to defendant Law Offices of the Los Angeles County Public Defender, its SVP Unit was established to defend those persons who were being committed to state mental institutions for potentially an indefinite term of commitment, and that its SVP Unit consists of experienced attorneys and paralegals practicing exclusively in this highly specialized area of law.

37.     DOE defendants 1 through 10, inclusive and each of them, are and were at all times relevant here, members of the Los Angeles County Board of Supervisors, appointed or elected officials of the County of Los Angeles, and agents, employees and/or representatives of defendant County of Los Angeles acting within their capacity as employees, agents and servants of the defendant County of Los Angeles and/or Law Offices of the Los Angeles County Public Defender.  Said defendants were policymakers with the authority to develop, modify, amend, ratify, implement, revoke, and rescind all policies, practices, procedures and customs of the Law Offices of the Los Angeles County Public Defender.  Said defendants, at all times alleged herein, where acting within said course and scope of that employment and agency, and at all times relevant hereto were acting under the color of law.  Said Defendants

FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1   are sued individually and in their personal capacity as supervisors, employees, agents

2   and/or representatives of defendant County of Los Angeles.

3       38.    The present plaintiff is ignorant of the true names and capacities of

4   defendants sued herein as DOE defendants 1 through 10, inclusive, and therefore sues

5   these defendants by such fictitious names.  Plaintiff will amend this complaint to

6   allege their true names and capacities when ascertained.  Plaintiff is informed and

7   believe and thereon allege that each of the fictitiously named defendants is

8   responsible in some manner for the occurrences herein alleged, and that Plaintiff's

9   injuries as herein alleged were proximately caused by the acts and/or omissions of

10  said fictitiously named defendants.

11

12                                    **V.**

13                    **STATEMENT OF RELEVANT FACTS**

14                                    **A.**

15      **Mr. Corey Williams' Due Process rights were violated by the 13-year**

16      **pre-trial detention.**

17      39.    The 13-year pre-trial detention of Mr. Corey Williams violated his due

18  process rights under the Fourteenth Amendment of the US Constitution.

19      40.    A delay of less than one year in getting to trial on an SVP petition may

20  alone violate a detainee's due process rights, citing *Doggett v. United States*, 505

21  U.S.at p. 652, fn. 1.  Courts have held "that 17 years of pre-trial detention is

22  presumptively prejudicial and oppressive to the maximum degree."  *People v.*

23  *Superior Court*, (2018) 27 Cal.App.5th 36, 54 (*Vasquez*).

24      41.    Following the decisions in *Vasquez*, *Litmon*, and *People v. DeCasas*,

25  (2020) 54 Cal.App.5th 785, in order to determine if there has been a violation of

26  plaintiff's due process rights and speedy trial rights, courts apply the tests established

27

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

by the United States Supreme Court in *Mathews v. Eldridge*, (1976) 424 U.S. 319 and *Barker v. Wingo*, (1972) 407 U.S. 514, would conclude as follows:

a.   Mr. Williams' more than 13 years of pre-trial confinement constituted a pretrial delay and that it was presumptively prejudicial and "oppressive to the maximum degree," requiring due process protection;

b.   Mr. Williams was not advised by the Los Angeles County Public Defender's Office of the consequences of the plea bargain in his underlying criminal matter that he accepted, which resulted in the SVP petition being filed against him and also resulted in more than 13 years of pre-trial civil confinement;

c.   Several attorneys in the SVP Unit have in other matters testified that upper management of the Los Angeles County Public Defender's Office did not respond to their complaints, and there was further testimony that indicated that retaliatory transfers occurred. There was not a single decision made by upper management in the Public Defender's Office that was in the best interest of the SVP clients, including Mr. Williams. This is the systemic breakdown;

d.   Mr. Williams asserted his speedy trial rights and sent letters to the judges and attorneys from the Los Angeles Public Defender's Office that represented him describing the "Hobson's choice" he faced when he was repeatedly asked whether he would agree to continue his case for trial, so that his attorneys would be prepared for trial.  They did not every adequately prepare for trial.  Due to this Hobson's Choice, Mr. Williams did not waive his right to a speedy trial;

e.   The statements and letters Mr. Williams wrote are descriptions of the "Hobson's choice" Mr. Williams was facing, the choice that he made,

49

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1      and is much more than the "enough is enough" comment made by

2      George Vasquez, discussed in his and the *DeCasas* cases;

3      f.      Mr. Williams, also, had **both** the right to a speedy trial **and** that the right

4              to competent, prepared counsel and that his comments, objections and

5              letters proved that one gave way to the other;

6      g.      Like *Vasquez[2]*, Mr. Williams was forced to acquiesce to his counsel's

7              demand for more time and forced to choose between proceeding to trial

8              without prepared counsel or giving up his right to speedy trial.  He had

9              the proverbial "Hobson's choice;"

10     h.      Had his case been brought to trial in a timely fashion and had he been

11             committed, he would have been committed for only a two-year period;

12     i.      There is ample testimony in court records from other matters about the

13             Los Angeles County Public Defender's Office's budget cuts and the

14             effect it had on the lack of timeliness of SVP cases, including Mr.

15             Williams's;

16     j.      There existed no fiscal or administrative burdens on the government that

17             could have possibly justified the lengthy pre-trial detention suffered by

18             Mr. Williams and, in fact, it would not have been any more of a fiscal or

19             administrative burden on the government to bring Mr. Williams to trial

20             at the beginning of his case;

21     k.      Mr. Williams's involuntary commitment was presumptively prejudicial,

22             particularly in light of the fact that he only faced a 2-year commitment

23             on the original petition;

24

25     [2] The appellant in *Vasquez*, George Vasquez, was also represented by the Los Angeles
       County Public Defenders' Office, including by some of the same attorneys, and he
26     spent 17 years in custody awaiting trial in his SVP proceedings.  Both Mr. Vasquez
       and Mr. Williams were concurrently in SVP proceedings at the time that the Los
27     Angeles County Public Defenders' office has been deemed to have been in a state of
       a "systemic breakdown."
28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

l.    The prejudice "could not be more clear," considering the fact that Mr. Williams had two negative evaluations, which found that he did not meet the criteria to be found an SVP;

m.    As Judge Brian Gasdia noted in the *Darryell Frazier* matter, "As the *Litmon*… court observed, time once passed can never be recovered," and the same is true in Mr. Williams case;

n.    Mr. Williams had a substantial liberty interest and, in light of the negative evaluations in his favor, the risk of an erroneous involuntary confinement was substantial, satisfying the first two prongs of the *Mathews* test;

o.    Each of Mr. Williams's trial dates were continued as a result of "a systemic 'breakdown in the public defender system.'";

p.    Deputy Public Defender 3 explained to Judge William Ryan, when asked why she had not filed a *Litmon-Vasquez* motion to dismiss the petition filed against Mr. Williams, that she was "restrained" from filing said motion to dismiss.  Judge Ryan scolded her and informed her that her ethical duty to her client cannot be usurped by the *policy* of the Los Angeles County Public Defender's Office.

42.    The lengthy detention was not of Mr. Williams's own making, Mr. Williams's trial dates were continued due to systemic breakdowns in the public defender's system, and he was faced with a Hobson's choice of acquiescing to his attorney's strategies, whatever they were, or go to trial with an attorney that was not timely prepared.  As such, Mr. Williams was not responsible for the long delay.

43.    Ultimately, there is "overwhelming" evidence that the long pre-trial detention of Mr. Williams showed a constitutional deprivation of both his speedy trial rights and due process rights.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

**B.**

**By 2006, there was already an institutional breakdown of the Public Defender System in Los Angeles County.**

44.     In the *Vasquez* case, both the trial court and the Court of Appeal of the State of California concluded that "the dysfunctional manner in which the public defender's office handled … Vasquez's case was precisely the type of systemic or institutional breakdown contemplated [by controlling authority]." *Vasquez*, 27 Cal. App. 5th at 73.

45.     A state of institutional breakdown existed as early as 2006 in the PD's Office.  In 2007, the Superior Court of Los Angeles County brokered an agreement with the PD's Office and the Office of the District Attorney to attempt to address the inability of the PD's Office to bring SVP cases to trial. In the Memorandum of Understanding that memorialized the agreement, the parties stipulated to the inability of the PD's Office to promptly bring SVP cases to trial.

46.     The agreement resulted from the enactment of new legislation in October of 2006 related to SVP proceedings and the term of commitment for those individuals who were adjudicated under the SVP Act. The new legislation made the term of commitment indefinite rather than two years.  The legislation applied to 64 pending SVP petitions which were being defended against by the PD's Office.

47.     This agreement provided that the PD's Office would bring the 64 cases to trial within 24 months.  The majority of the cases subject to this agreement were at least three years old by the time the agreement was entered into.

48.     Shortly after entering into the agreement, defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez determined that the SVP unit did not have the staff and other resources to bring the 64 cases to trial within the 24 months they had agreed to.   This put the 64 SVP clients at risk of losing the benefit of the two-year commitment term.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Likewise, this also put the PD's Office in conflict of interest.  The lawyers in the SVP unit had to choose which clients would go to trial in the 24-month period and which clients would not.

49.     Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez realized that this created an ethical and liability problem for them and the PD's Office.  Accordingly, they sought to be relieved as counsel in the 64 cases.

50.     These defendants did not inform the 64 SVP clients or Mr. Williams when his case was assigned to the Public Defender's Office in January 2008 of this agreement, of their intention to be relieved as counsel or of the implications of not bringing their cases to trial within 24 months, including the impact of being committed to state civil detention for an indefinite period.

51.     After several months of effort, the Superior Court determined that it could not find an adequate number of private attorneys willing and qualified to assume representation of the SVP clients that the PD's Office was unable to handle.  SVP litigation was, and is, meaningfully different than normal criminal defense work.  SVP cases consist of voluminous files, complex medical issues are intertwined with the legal issues, and extensive expert evaluations are essential to the successful defense of these cases.  Although brought by prosecutors and pursued in the criminal courts, SVP cases are civil cases with all the proceedings common in civil litigation that are, for the most part, foreign to criminal practitioners, such as the taking of depositions.   The field is so specialized that very few private practitioners in California practice SVP defense.

52.     Because the court could not find adequate numbers of private attorneys to handle the subject 64 cases, the court, the PD's Office and the DA's office entered into another agreement regarding these 64 cases.  The District Attorney's Office offered to withdraw the 24-month time limit to bring the cases to trial, if the PD's

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    Office agreed to retain the cases.  The agreement, however, also provided that the 64

2    SVP clients waive their right to have their case brought to trial promptly, within the

3    24-month period, so as to avoid indefinite commitment.   Defendant Michael Suzuki

4    was the representative from the PD's Office that signed the memorandum of

5    understanding.

6         53.    The intention of the agreement was to ensure that the 64 SVP clients

7    would have "competent representation and that they would not be deprived of due

8    process because of a lack of County, attorney and judicial resources."  This intent was

9    never honored by the County of Los Angeles, the PD's Office, or defendants Ronald

10   Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel

11   Kuperberg, and Ruben Marquez

12        54.    Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green,

13   Michael Suzuki, Daniel Kuperberg, and Ruben Marquez accepted this agreement and

14   agreed to retain all of the 64 cases.  They did not notify Mr. Williams upon being

15   assigned his case in January 2008, or the other 64 SVP clients, that the PD's Office

16   had admitted that they were in disarray and could not bring their SVP case load to

17   trial in a timely matter, that they were so overburdened that they should not be taking

18   on any new cases, that they had waived their right to speedy trial and that the PD's

19   Office had agreed to risk their indefinite commitment.

20        55.    The agreement was memorialized in a memorandum of understanding in

21   May of 2007 and provided for the continuing representation by the PD's Office of 64

22   SVP clients that were subject to the new legislation.  The previously-agreed-to 24-

23   month time period to bring the cases to trial was waived by the PD's Office and the

24   County of Los Angeles agreed to provide additional resources to the PD's Office to

25   enable the PD's Office to handle the increased workload and so these cases would be

26   brought to trial promptly and competently.  Implicit in this understanding is that the

27   PD's Office was so overwhelmed and overworked that they could not bring their

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

current case load to trial in a timely manner, much less take on any additional cases in the immediate future, such as Mr. Williams', and bring his case to trial in a timely manner.  This was an implicit admission that the PD's Office was in a state of systemic dysfunction.

56.     The County of Los Angeles provided more than $1,200,000 to the Public Defender's Office to ensure that the retained SVP cases would be competently brought to trial.  The PD's Office and defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez accepted these resources, but did not dedicate any of the funding to the SVP unit. They did not hire or transfer new lawyers to work in the SVP Unit nor did they did change the way they managed SVP cases.  They did not modify the structure of the SVP Unit in any way, or otherwise meaningfully change the way they defended SVP cases so as to ensure that their SVP clients would receive "competent representation and that they would not be deprived of due process because of a lack of County, attorney and judicial resources."

57.     To the contrary, nothing changed.  The admitted inability to bring these cases to trial promptly, the conflicts of interest, and the essential abandonment of their SVP clients persisted.  Mr. Williams's case was assigned to this SVP Unit in disarray in January 2008.  The PD's Office should have never accepted his case due to the dysfunction already prevalent in the public defender system.  Not until 2019, when private counsel was appointed to represent Mr. Williams, did he have any meaningful work done on his case. Shortly thereafter, his case was dismissed.

58.     From 2007, when the above agreement was entered into, until approximately April of 2014, the SVP unit remained under-staffed, overworked and unable to handle the amount of SVP cases that were assigned to it.  None of the 64 cases, nor Mr. Williams's case, were brought to trial in the previously contemplated 24-months.  In fact, because of the overwhelming amount of cases and related work

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   that each of the lawyers in the SVP Unit had to manage, between 2007 and 2014 less

2   than four SVP cases were brought to trial each year by the PD's Office.   The same

3   institutional breakdown that the courts have recognized as having existed in the PD's

4   Office between 2014 and 2019 also existed between 2002 to 2014.

## C.

**Plaintiff's 13-year ordeal as an SVP pre-trial detainee.**

7          59.     In 1999, Corey Williams accepted a plea bargain as part of a deal to

8   reduce the sentence he was facing had he gone to trial and was convicted.  An

9   attorney from the Los Angeles County Public Defender's Office represented him for

10  his criminal offense at the time.  The SVP Act was enacted in California in 1996.  It

11  provided that certain individuals who had a qualifying sex-related conviction could

12  have a petition filed against them to determine whether they are considered an SVP

13  and would, at that time, be committed to a state hospital for treatment of the alleged

14  mental condition.  Such individuals would, therefore, be subject to additional

15  mandatory confinement until either their petition was dismissed or they were

16  determined not to meet the criteria of an SVP.  As would be seen, the vast majority of

17  those who had SVP petitions filed against them would not see a trial to determine if

18  they were SVPs for years, if not decades.  When Mr. Williams took the plea bargain,

19  his deputy public defender did not advise him that he may be subject to the provisions

20  of the SVP Act, and, therefore, may be civilly committed for years or, as in Mr.

21  Williams case, more than a decade.  Had he been aware of said SVP consequences,

22  Mr. Williams would not have accepted said plea deal and would have either

23  negotiated a plea without the possibility of civil confinement or would have gone to

24  trial.  Mr. Williams accepted the plea and served more than 8 years in state prison.

25  On January 30, 2008, near the end of his sentence, and before he was released from

26  prison, the Los Angeles County District Attorney's office filed a petition for civil

27  commitment pursuant to California *Welfare & Institutions Code*, section 6600 et seq.

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

60.     Throughout the majority of Mr. Williams's 13-year detention, he was represented by attorneys from the Los Angeles County Public Defender's Office.

61.     For the first six years after the petition was filed, Williams was represented primarily by Deputy Public Defender Number 1 (hereafter also "DPD1"). DPD1 is not a defendant in the present action. However, before DPD1 appeared, then-Deputy Public Defender Defendant Michael Suzuki appeared before the Honorable Dennis Landin for the probable cause hearing on February 6, 2008. The court found probable cause.

62.     According to the court's minute orders, Mr. Williams' appearance was waived seven times by DPD1: July 17, 2009, October 5, 2009, December 8, 2009, March 5, 2010, June 11, 2010, August 12, 2010, and March 18, 2014.

63.     Williams appeared by video conference on October 22, 2010, January 13, 2011, February 24, 2011, April 28, 2011, June 1, 2011, September 14, 2011, January 6, 2012, April 20, 2012, August 3, 2012, November 16, 2012, February 15, 2013, and August 12, 2013.

64.     Mr. Williams's first court appearance was on February 13, 2008, before the Honorable Dennis Landin. Mr. Williams appeared in court. DPD1 represented him from the Los Angeles County Public Defender's Office. DPD1 waived time for the probable cause hearing.

65.     Mr. Williams appeared in court next on April 3, 2008. All parties remained the same.

66.     DPD1 again stipulated to a continuance.

67.     On April 22, 2008, Mr. Williams celebrated his 34th birthday while detained at Coalinga State Hospital.

68.     On August 5, 2008, Williams's first probable cause hearing was conducted without any witnesses before the Honorable Dennis Landin; however, this

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

probable cause hearing was later determined to be invalid. Respondent's counsel, DPD1, moved to submit on the reports of the WIC 6600 evaluators.

69.     DPD1 moved to dismiss for insufficient evidence and the motion was denied. The court found probable cause as against Mr. Williams. DPD1 stipulated to continue the matter to January 6, 2009.

70.     Mr. Williams was not in court on January 6, 2009, when DPD1 appeared before the Honorable Melissa Widdifield. The case was continued on a motion by DPD1 to July 15, 2009.

71.     On April 22, 2009, Mr. Williams celebrated his 35th birthday while detained at Coalinga State Hospital.

72.     Mr. Williams was not in court on July 17, 2009, when a Los Angeles County Deputy Public Defender appeared for DPD1 before the Honorable Melissa Widdifield. The case was continued on a motion by DPD1 to October 5, 2009.

73.     Mr. Williams was not in court on October 5, 2009, when DPD1 appeared before the Honorable Melissa Widdifield. The case was continued to December 8, 2009.

74.     Mr. Williams was not in court on December 8, 2009, when DPD1 appeared before the Honorable Melissa Widdifield. The case was continued to March 5, 2010. DPD1 waived Mr. Williams' time without his knowledge or consent. Mr. Williams was not in court on March 5, 2010, when DPD1 appeared before the Honorable Melissa Widdifield. The case was continued to June 11, 2010. DPD1 waived Mr. Williams' time without his knowledge or consent.   The court ordered counsel to obtain a written waiver of time and appearance at the next court hearing.

75.     On April 22, 2010, Mr. Williams celebrated his 36th birthday while detained at Coalinga State Hospital.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

76.     Mr. Williams was not in court on June 11, 2010, when DPD1 appeared before the Honorable Melissa Widdifield.  The case was continued to August 12, 2010.  DPD1 waived time for trial again without a written waiver from Mr. Williams.

77.     On June 11, 2010, Mr. Williams wrote to DPD1's paralegal, and said, "I know it's only been 2 years but I'm ready to go to trial. [Paralegal], I'm tired of sitting in this hospital.  [DPD1] always talks me into waiving time, and I feel she is manipulating me. ***I want to go to trial***." (emphasis added) Additionally, on that same date, Mr. Williams sent a letter addressed directly to DPD1 that states, "I've talked to some other guys here and there are some guys who have been here, 5-6 years. I do not want to be sitting here that long."

78.     Mr. Williams was not in court on August 12, 2010, when DPD1 appeared before the Honorable Melissa Widdifield. The case was continued to October 22, 2010. DPD1 waived time for trial again without a written waiver.

79.     Mr. Williams appeared by video on October 22, 2010, when DPD1 appeared before the Honorable Melissa Widdifield. The case was continued to April 8,  2011, on DPD1's motion.

80.     Mr. Williams appeared by video on January 13, 2011, when DPD1 appeared before the Honorable Samantha Jessner. The case was continued to February 24, 2011.

81.     Mr. Williams appeared by video on February 24, 2011, when DPD1 appeared before the Honorable Phillip Argento. The case was continued to April 28, 2011, on DPD1's motion.

82.     On April 22, 2011, Mr. Williams celebrated his 37th birthday while detained at Coalinga State Hospital.

83.     Corey Williams appeared by video on April 28, 2011, when a substitute Los Angeles County Deputy Public Defender appeared for DPD1 before the

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Honorable Carlos Vasquez. The case was continued to June 1, 2011, on the substitute DPD's motion.

84.     Mr. Williams appeared by video on June 1, 2011, when DPD1 appeared before the Honorable Carlos Vasquez. The case was continued to September 14, 2011, for pre-trial.

85.     Mr. Williams appeared by video on September 14, 2011, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to January 6, 2012.

86.     Corey Williams appeared by video on January 6, 2012, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to April 20, 2012.

87.     Mr. Williams appeared by video on April 20, 2012, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to August 3, 2012.

88.     On April 22, 2012, Corey Williams celebrated his 38th birthday while detained at Coalinga State Hospital.  Under *WIC* section 826, subdivision (a), juvenile records, in cases such as Mr. Williams, are automatically destroyed on the juvenile's 38th birthday. (See, WIC § 826, subd. (a).)

89.     Mr. Williams appeared by video on August 3, 2012, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to November 16, 2012. DPD1 again waived time without a written waiver.

90.     On September 5, 2012, Corey Williams wrote a letter to DPD1 that stated, in part, "I want to go to trial before this year or [at] the latest January of next year. I'm tired of waiting."

91.     Mr. Williams appeared by video on November 16, 2012, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to February 15, 2013, for probable cause setting.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

92.     Mr. Williams appeared by video on February 15, 2013, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to July 7 -10, 2014, for probable cause hearing.

93.     On April 16, 2013, Corey Williams wrote to DPD1, stating, "Trial. trial. trial. Hey, my birthday is in six days. I don't want to be here on my next birthday."

94.     On April 22, 2013, Corey Williams celebrated his 39th birthday while detained at Coalinga State Hospital.

95.     Mr. Williams appeared by video on August 12, 2013, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to December 10, 2013, for status conference - probable cause hearing dates remained set.

96.     Mr. Williams appeared by video on December 10, 2013, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to March 18, 2014.

97.     On February 13, 2014, Mr. Williams wrote to DPD1, stating: "I've been expressing my desire to go trial for several years now, but I guess what I want doesn't matter. You know that I don't know anything about the law and that this... is very confusing to me. You use that against me... This will be my last letter to you....My cooperation with you has ended."

98.     On March 18, 2014, at a court hearing before the Honorable Elaine Mandel, a substitute Los Angeles County Deputy Public Defender stood in for DPD1. The probable cause hearing remained set for July 14-17, 2014.

99.     Mr. Williams appeared by video on April 8, 2014, when DPD1 appeared before the Honorable Elaine Mandel. The case was continued to May 7, 2014.

100.   On April 22, 2014, Corey Williams celebrated his 40th birthday while detained at Coalinga State Hospital.  This was the sixth birthday Mr. Williams celebrated in the hospital without a trial.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

101. On May 7, 2014, DPD1 was out on medical leave and a substitute Los Angeles County Deputy Public Defender appeared for her. The Honorable Elaine Mandel asks, "So how are we six years into this case and we have not had a probable cause hearing... ?" The case was continued to May 12, 2014.

102. At the May 12, 2014, hearing, DPD1 was again out on medical leave. A substitute Los Angeles County Deputy Public Defender appeared for DPD1. The Honorable Elaine Mandel stated, "Mr. Williams's case is very old. The petition was filed back in 2008. It is 2014. How is it possible that almost six years later [DPD1] is not going to be ready for a probable cause hearing? I'm sorry. It's more than six years. The petition was filed in January of 2008." At this same hearing, the Deputy District Attorney stated, "Your honor, *based on Mr. Williams' request essentially for a speedy trial*, we're invoking *Litmon*. So, I don't want to take the jury dates off, and I ask that they stand." (emphasis added) Mr. Williams stated, "I'm frustrated. Because if I ask for another attorney, then I got to - - date will be put off because new attorney has to come in and get familiar with the case. I'll still get screwed in the long run. I'll go with whatever you guys recommend. I don't know what to do." Corey Williams, at the hearing, put the court and the attorneys, including his own, on notice of the Hobson's Choice he was facing.

103. The court responded by telling Mr. Williams it cannot make recommendations but advised Mr. Williams of his right to make a *Marsden* motion to determine whether his attorney was representing him effectively.

104. For the next four years, Corey Williams was represented by Deputy Public Defender Number 2 (hereafter also "DPD2"). DPD2 represented Williams from June 2014 through October 22, 2018.

105. Mr. Williams appeared by video conference on June 6, 2014, and was represented by DPD2. The Honorable Elaine Mandel presided. Good cause for continuance of the probable cause hearing was granted *over the Deputy District*

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   *Attorney's objection* because Mr. Williams' counsel was reassigned.  A status

2   conference was set for August 8, 2014. The probable cause hearing was set for

3   December 8-10, 2014.

4           106.    DPD2 waived Mr. Williams's appearance on August 8, 2014, and he was

5   represented by DPD2. Honorable Elaine Mandel presided. A status conference was

6   set for October 29, 2014.  The probable cause hearing remained set for December 8-

7   10, 2014.

8           107.    Mr. Williams appeared by video conference on October 29, 2014.

9   DPD2 asked the court to vacate the probable cause hearing dates set for December 8-

10  10, 2014, but the court declined his request.

11          108.    Mr. Williams's appearance was waived by DPD2 on November 25,

12  2014, and he was represented by DPD2.  The Honorable Elaine Mandel presided. A

13  status conference was set for January 26, 2015. The probable cause hearing was

14  vacated for December 8-10, 2014, and reset for April 17 and 20, 2015, and May 1,

15  2015.

16          109.    Mr. Williams appeared by video conference on January 26, 2015, and

17  was represented by DPD2.  The Honorable Elaine Mandel presided. A status

18  conference was set for March 13, 2015.

19          110.    Corey Williams appeared by video conference on March 13, 2015, and

20  was represented by DPD2. The Honorable James Bianco presided. A status

21  conference was set for April 6, 2015.  Dr. Thomas MacSpeiden replaced Dr. Gary

22  Zinik as one of the state's evaluators, but his report was not ready.

23          111.    Mr. Williams appeared by video conference on April 6, 2015 and was

24  represented by DPD2.  The Honorable James Bianco presided.  DPD2 stated that Dr.

25  MacSpeiden's evaluation was not ready and they needed to vacate the April probable

26  cause hearing dates. The Court asked Mr. Williams if he was okay with postponing

27  the hearing.  Mr. Williams responded, "Not really. It's been postponed for eight years

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

now."  The Honorable James Bianco responded, "I am as frustrated as Mr. Williams is if his case has been pending for eight years. I mean it is inconceivable to me that we are in the place that we haven't had a probable cause hearing in eight years."

112.   When Judge Bianco asked what the delay was.  Mr. Williams responded, "The other judge, when this was set back in November, she ordered the DA to do his updates, and [the DDA] failed to do that. And I came to court two other times, and the judge kept asking [the DDA] what's up with your reports.  And I am not trying to be difficult, your honor, I am just saying this is my life. I have been sitting here for nine years and for nothing."

113.   Despite his pleas to the court and at the request of court, Mr. Williams agreed to a further continuance, "I am willing to wait until May 7th to see what is going on, but after that I am not really willing to put off too much time. I am just here putting off time over and over again. We are not going anywhere."

114.   The Honorable Judge Bianco added, "[I]t's a probable cause hearing. It's supposed to happen within ten days of the filing of the petition and it's been eight years."  The court asked Mr. Williams how he felt about an August 2015 probable cause hearing and Mr. Williams responded, "I really don't like it, but I want to be as accommodating as I can as I have been for years. So, if that is what I can get, I will take that for now."

115.   On April 22, 2015, Corey Williams celebrated his 41st birthday while detained at Coalinga State Hospital.

116.   Mr. Williams appeared by video conference on May 8, 2015, and was represented by DPD2. The Honorable James Bianco presided. A status conference was set for July 10, 2015. The probable cause hearing was set for September 1 and 3, 2015.

117.   Mr. Williams appeared by video conference on July 10, 2015, and was represented by DPD2. The Honorable James Bianco presided. A status conference

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   was set for August 18, 2015. The parties stipulated to Commissioner Hymowitz
2   hearing the probable cause hearing. The probable cause hearing remained set for
3   September 1 and 3, 2015.

4       118.   Mr. Williams appeared by video conference on August 18, 2015 and was
5   represented by DPD2. The Honorable James Bianco presided.  The probable cause
6   hearing remained set for September 1 and 3, 2015.

7       119.   Corey Williams' probable cause hearing after more than 7 years of
8   waiting was held on September 1 and 3, 2015.  The court, despite the evaluators'
9   reports being based on inadmissible hearsay upon hearsay, found probable cause as
10  against Mr. Williams.

11      120.   Mr. Williams appeared by video conference on December 10, 2015, and
12  was represented by DPD2. The Honorable James Bianco presided. The matter was
13  continued to May 24, 2016, for pretrial.

14      121.   On March 15, 2016, Mr. Williams wrote a letter to DPD2 that stated, in
15  part, "Let's go ahead and move forward from this and proceed to trial. I'm ready to
16  proceed and no more waiting."

17      122.   On April 22, 2016, Corey Williams celebrated his 42nd birthday while
18  detained at Coalinga State Hospital.

19      123.   Mr. Williams appeared by video conference on May 24, 2016, and was
20  represented by DPD2.  The Honorable James Bianco presided. The matter was
21  continued to October 4, 2016, for pretrial conference.

22      124.   Mr. Williams appeared via video conference on October 4, 2016, and
23  was represented by DPD2. The Honorable James Bianco presided.  The matter was
24  continued to December 8, 2016, for pretrial.

25      125.   On October 5, 2016, Mr. Williams wrote a letter to DPD, that states, in
26  part, "Why did you get rid of Judge Bianco? Did you get rid of him because he
27  listened to my complaint against you and he agreed with me that this case has been

28

65

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

pending too long? ... You didn't even tell me you are going to file a 170.6., or why you did it in the first place... I've told you that I want to go to trial in our many conversations and in my letters. You always manipulate me into waiving time, the time that I have waived has been under duress." Corey Williams, at that time, informed his attorney that he had not ever given a free, informed and voluntary waiver of time.

126.    On December 8, 2016, Mr. Williams's appearance was waived by the Public Defender's Office. A substitute Deputy Public Defender appeared in court for DPD2 and informed the court of DPD2's desire to put the case over for two months, explaining in complete contradiction to the facts up to that point, "this is not a case that he was in a push to go to trial and I don't believe the client is demanding to go to trial." Again, the Public Defender's Office waived time over Mr. Williams desires and objections. He had, in fact, on numerous occasions to that date demanded to go to trial. The Honorable James Bianco presided. The matter was continued to February 23, 2017, for pretrial conference.

127.    On February 23, 2017, Mr. Williams appeared by video conference and was represented by DPD2. The Honorable James Bianco presided. The Honorable James Bianco notified the parties he was in receipt of DPD2's 170.6 affidavit, which was filed without Mr. Williams' knowledge or consent, and that the matter was set in Dept. 95 for June 20, 2017.

128.    On February 27, 2017, Corey Williams appeared via video conference and was represented by DPD2. The Honorable Roberto Longoria presided. Mr. Williams filed a Writ of Habeas Corpus, received on December 28, 2016. Without considering the merits of the petition, it was denied. The writ was denied as improper because Williams was represented by DPD2 and the court ruled he was, therefore, not permitted to file a writ of habeas corpus in pro per.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

129.   Mr. Williams, thereafter, sought a Writ of Mandate in the Court of Appeal, which was also denied because denial of a *Marsden* motion is not an appealable order. The matter was ordered off calendar.

130.   On April 22, 2017, Corey Williams celebrated his 43rd birthday while detained at Coalinga State Hospital.  This birthday represented a decade worth of birthdays Mr. Williams celebrated in confinement without a trial.

131.   On June 20, 2017, Mr. Williams's appearance was waived by DPD2. DPD2 appeared in court before the Honorable Roborto Longoria and requested a continuance of the case until September 26, 2017, which was granted without any reason being provided for the need for the continuance, and he represented that he was waiving Mr. Williams's appearance with his permission, which was a false representation to the court.

132.   On September 26, 2017, Mr. Williams appeared via video conference and was represented by DPD2. The Honorable Roberto Longoria presided. The matter was continued to December 14, 2017, for pretrial conference.

133.   On December 14, 2017, Williams appeared via video conference and was represented by DPD2.  The Honorable Roberto Longorio presided. The matter was continued to April 5, 2017, for pretrial conference.

134.   On March 19, 2018, Mr. Williams requested that his lawyer, DPD2, be replaced under *Marsden* and his request was denied. DPD2 appeared before the Honorable Judge Ryan.

135.   Judge Ryan asked DPD2, "Where are you on this case because it seems to me you have had lots and lots of chances to move this case forward?" DPD2 said that the state would be requesting updates from its evaluators.  The requested continuance of DPD2 was granted until June 11, 2018.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

136.   On April 22, 2018, Corey Williams celebrated his 44th birthday while detained at Coalinga State Hospital.  At that date, he had celebrated 11 birthdays and spent more than a decade in confinement without trial.

137.   On May 23, 2018, the court updated its records to reflect that the Court of Appeal had issued its Remitter and dismissed the appeal Mr. Williams had filed after his *habeas* petition has been denied in February 2017.

138.   On June 11, 2018, Mr. Williams appeared via video conference and was represented by DPD2.  The Honorable William Ryan presided. The matter was continued to September 24, 2018, for pretrial conference.

139.   On July 24, 2018, the court noted in its records that a *Marsden* hearing was continued to August 6, 2018.

140.   Mr. Williams appeared via video on August 6, 2018, before the Honorable Judge Ryan and sought to discharge his lawyer, DPD2, but his motion was denied.  After his request was denied, Judge Ryan asked Mr. Williams, "Do you want to go forward with your trial even though your lawyer hasn't had the expert look at the People's updates?  "Williams responded: "Obviously that wouldn't be in my best interest, so, no.'  The court's minute order of this date reflects that Mr. Williams wants his speedy trial.  Judge Ryan later added, "Probably after you get your evaluation and get the People's experts, I'm not going to entertain motions to continue. This is going to trial sooner rather than later."  The matter was continued to September 24, 2018, for pretrial.  Mr. Williams again had let the Court know of the Hobson's Choice he was constantly presented with.

141.   Mr. Williams appeared via video on September 24, 2018, before the Honorable Judge Ryan. DPD2 notified the court that he was being transferred. Corey Williams made an oral Litmon-Vasquez motion, but the court did not rule on the motion. The matter was continued to December 10, 2018, for pretrial conference.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  Two packages of subpoenaed records were handed to DPD2 and chain of custody

2  was stipulated to, but authenticity was not.

3       142.   In the handwritten minute order of this date, the court notes that Mr.

4  Williams wants a motion to dismiss because of the, at that date, 11-year delay in

5  having his matter heard for trial.

6       143.   Mr. Williams appeared via video on October 1, 2018, before the

7  Honorable Judge Ryan.  Mr. Williams orally moved to present a third *Marsden*

8  motion to have the Los Angeles County Public Defender's Office removed as his

9  attorneys of record. The court found no conflict.

10      144.   Defendant Dan Kuperberg appeared on behalf of the Public Defender's

11 Office to inform the court that the case will be reassigned and no Litmon-Vasquez

12 motion to dismiss will be filed (over Corey Williams' instructions and wishes). Judge

13 Ryan stated, "This case has been pending for 10 years and 8 months. There have been

14 55 appearances. This is only the second change in public defenders."  Defendant Dan

15 Kuperberg responded, "We are not prepared to go to trial. We don't have a lawyer

16 ready to go on this case right now. There is no lawyer to date on this case. It was

17 [DPD2's] case up until Friday and I will reassign this by the end of the week, but no

18 lawyer is going to be ready to go to trial on this for two to three months. When the

19 court asked Corey Williams for his response, Mr. Williams responded, "I don't want

20 the public defender's office to represent me. I believe there is a conflict."

21      145.   Incredibly, the *Marsden* motion was heard and denied, despite numerous

22 judges questioning the delays in Mr. Williams' case, despite the fact that the public

23 defender's office transferred DPD2 and Mr. Williams had no current deputy public

24 defender assigned to his matter, and despite the fact that Defendant Kuperberg

25 represented to the court that no attorney from the public defender's office, which had

26 been assigned to represent Mr. Williams for 11 years, would be able to take the case

27 to trial for the next 2-3 months, which was no earlier than January 2019.

28

69

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

146.   Mr. Williams also, again, notified the court of his wish to go to trial. The matter was continued to October 22, 2018, for pretrial conference.

147.   Williams appeared by video on October 22, 2018, before the Honorable Judge Ryan.  A supervisory attorney from the Public Defender's Office, Lara Kislinger, appeared and notified the court and Corey Williams that DPD3 would be assigned the case.  Mr. Williams appeared via video and made an oral *Falsetta* motion to represent himself that was denied because the court stated an SVP defendant does not have the right to represent himself in an SVP civil proceeding. Mr. Williams also made another *Marsden* motion to have the Los Angeles County Public Defender's Office removed on this date that was denied.

148.   From December 2018 through November 4, 2019, Williams was represented by DPD3 from the Public Defender's Office. The Honorable William Ryan presided.  Mr. Williams appeared via video on December 10, 2018, before Judge Ryan. DPD3 appeared for Corey Williams. Newly assigned DPD3 agreed to a continuance.

149.   On February 25, 2019, Williams filed a Motion for Replacement of Counsel that states in relevant part, "On many numerous occasions, respondent has tried to persuade his attorneys (Public Defenders) … to move the case forward to trial, refusing any more extensions of time... [E]nough is enough.  I am demanding my trial." Mr. Williams alleged that he was receiving ineffective assistance of counsel, his attorneys failed to prepare a defense to the petition and that his counsel failed to obtain expert and lay witnesses. Williams submitted a written *Marsden* motion that was denied.

150.   DPD3 was ordered by the court to file a *Litmon-Vasquez* motion to dismiss on behalf of Mr. Williams.  But, in accord with defendants' long-standing policy and custom wherein its attorneys are not permitted to file writs, appeals or law and motion that would be counter to defendants' interests, DPD3 told Judge Ryan

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   that she could not file said motion to dismiss because it was a "conflict."  Judge Ryan

2   responded that DPD3 had a "duty to litigate for [her] client."  DPD3 responded, "I do,

3   but *I am restrained*." (emphasis added)  Judge Ryan, in recognition of defendants'

4   policy and custom of not filing writs, appeals and motions that would run counter to

5   defendants' interests or put defendants in a negative light, noted "your office *policy*

6   can't override your ethical duty."

7       151.   After Judge Ryan noted the ethical obligations of the PD's office to Mr.

8   Williams, DPD3 presented the request to her supervisors, including Administrative

9   Defendants, and was told not to file the motion.  By that point, Administrative

10  Defendants knew that Judge Ryan's admonishments about their conflict was accurate

11  and that they were, in fact, in conflict with Mr. Williams and had been in such a

12  conflict with him for at five years, and certainly since the publishing of the opinion in

13  *Vazquez*.  Despite this, Administrative Defendants forbade DPD3 from filing a

14  motion to dismiss under Vasquez, because it would unequivocally establish civil

15  liability against them, the PD's office and the County of Los Angeles, as well as

16  create a further precedent against them for failing to timely bring another SVP case to

17  trial.  Notwithstanding that a motion under *Litmon* was well overdue, and

18  notwithstanding that the court had ordered that such a motion be filed, Mr. William's

19  constitutional right to a speedy trial had long been violated by this point.

20      152.   The trial date of May 15, 2019, was advanced and vacated.

21      153.   On April 22, 2019, Corey Williams celebrated his 45th birthday while

22  detained at Coalinga State Hospital.  This marked the 12th birthday he celebrated in

23  confinement without trial.

24      154.   On May 13, 2019, Mr. Williams appeared via video and the court and

25  counsel informed Mr. Williams the matter would be continued.  Mr. Williams

26  objected to the continuance. The matter was continued on the court's motion to June

27  10, 2019.

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

155.   On June 10, 2019, Williams appeared via video, and the court granted a motion prepared by DPD3 for new evaluations. Because the evaluators had relied on information contained in juvenile court records that had not been obtained using proper procedures as detailed in *WIC* Section 827, DPD3 sought to dismiss the holding order for probable cause based upon legal error by the evaluators for relying on this information in their reports, evaluations, and in their testimony, which should have been found to be inadmissible; however, her motion for a new probable cause hearing was denied.  She did not, however, file a *Litmon-Vasquez* motion to dismiss as Judge Ryan had requested in February 2019.

156.   The court granted DPD3's motion to conduct new evaluations. Mr. Williams' juvenile records were used by state evaluators for their reports finding he met the criteria for an SVP from the Department of State Hospitals even though the procedure set forth in Welfare and Institutions Code Section 827 had not been followed to allow them access to these records. At the June 2019 hearing, the court also ordered new evaluations to be written that did not use records obtained from Mr. Williams' juvenile records unless the juvenile records were first lawfully obtained and disseminated.  The case was continued for pretrial conference set for September 9, 2019.

157.   On July 22, 2019, Mr. Williams appeared via video in court and his motion to purge the juvenile records was granted. To make certain that the state evaluators received the message, and everyone understood the court's order, the court conducted a second hearing in July 2019 with legal counsel from the Department of State Hospitals in attendance where the court informs those in attendance: "motion to purge... is granted. DSH to purge from its files as to [Corey Williams'] all juvenile records." The case was continued for pretrial set on September 9, 2019.

158.   In a June 21, 2019, email exchange with a California Department of State Hospitals SVP analyst, Dr. MacSpeiden, one of the state's evaluators,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

acknowledged that had he not had Mr. Williams' juvenile records when he conducted his evaluations in 2015 and 2018, he would have found that Mr. Williams did *not* meet the criteria of an SVP.  Indeed, Dr. MacSpeiden opined, "[w]ithout knowledge of the juvenile records, the trier of fact will wonder why this matter has been brought into a courtroom."

159.   The Public Defender's Office was aware of the use of the juvenile records by the prosecution's experts since Mr. Williams' case was first filed.  No effort was made to challenge the use of the records until Mr. Williams began to file *Marden* motions.

160.   Corey Williams sent several letters to DPD3 requesting that she conflict off his case. On July 25, 2019, Mr. Williams wrote, in relevant part, "I intend to move for a hearing to order to address an actual conflict of interest … " On August 14, 2019, Mr. Williams wrote to DPD3 and stated, "[a]s you know, Judge Ryan strongly suggested that you prepare a motion to dismiss on my behalf ... you replied, 'Which would be a conflict.'  I direct your attention to People v. Jones (1991) 53 Cal. 3d 1115, 1136-1137."  Finally, Mr. Williams sent a letter dated September 10, 2019, that enclosed the Notice of Actual Conflict he had filed in court.

161.   On September 9, 2019, Williams appeared via video and objected to a continuance requested by counsel to November 4, 2019. Mr. Williams also sent a letter to the court on this date that notified the court that Mr. Williams had sent a letter to DPD3 requesting her to conflict off his case for " unreasonable delays" and that indicated he had notified DPD3 that she had an actual conflict.

162.   On or about September 13, 2019, Dr. Goldberg, another state evaluator, submitted his updated *WIC* 6600 evaluation that improperly referred to and relied on four juvenile court records from Los Angeles Superior Court, Case No. PJ04120 in rendering his diagnosis.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

163.   On November 4, 2019, DPD3 declared a conflict between Mr. Williams and the entire Los Angeles County Public Defender's Office, and the court appointed Mark Brandt as counsel.

164.   From November 2019 through early 2021, Mr. Brandt filed and won several motions seeking to have Corey Williams' juvenile records destroyed as well as information obtained from those records that were not the records themselves.

165.   On or about February 2, 2021, Mr. Brandt filed a *Litmon-Vasquez* motion to dismiss the petition filed against Corey Williams as a result of his due process rights being violated by the Los Angeles County Public Defender's Office.

166.   On or about May 11, 2021, the Los Angeles County District Attorney's filed an "Announcement of Inability to Proceed" with the SVP petition filed against Corey Williams.  The Declaration of the deputy public defender stated that the state's evaluators both filed evaluations that Mr. Williams did not meet the criteria of an SVP.

167.   On April 22, 2020, and April 22, 2021, Corey Williams celebrated his 46th and 47th birthdays, respectively, while detained in Coalinga State Hospital. His SVP petition was never brought to trial and Mr. Williams celebrated a total of 14 birthdays in civil confinement…with no trial.

168.   Defendant Michael Suzuki, currently a Division Chief within the Public Defender's Office and previously the head of the SVP unit from 2009 through 2011, testified in the *Darryell Frazier* matter's *Litmon/Vasquez* proceedings that in 2013, when he was head deputy in the Long Beach branch, he was consulted on staffing reassignments and decreases in the SVP unit that later took place in 2014.  He testified that he was asked for his opinion as to whether the SVP unit could absorb a decrease in staff based on two things: the decrease in the filing of new petitions and the progress made on existing petitions. Defendant Suzuki testified that during the recession, the Public Defender's Office had experienced both a hiring and

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

promotional freeze and that all divisions, especially the felony trial division, were significantly understaffed. He stated that it was his opinion, based on his experience as a previous head deputy of the SVP unit, that the unit could absorb the staffing cuts so that attorneys could be sent to the felony trial division.

169.   In the *Rodrigo DeCasas* matter, one of the deputy public defenders, David Santiago (hereafter "Santiago") testified in Mr. DeCasas' underlying *Litmon/Vasquez* proceedings that there were two staffing cuts in 2014: in June and September. Over the span of the cuts, Santiago's case load jumped from 8 cases to 14. Even after Santiago received the redistributed cases due to the 2014 staffing cuts, and until the time Santiago left the unit in 2017, he had absorbed three more cases.

170.   Another of the deputy public defenders that testified in the *DeCasas* matter, Craig Osaki, (hereafter, "Osaki") testified in the underlying Litmon/Vasquez proceedings that in 2014, during his tenure as Deputy-In-Charge of the SVP unit, approximately fifty percent of the SVP unit's staff was cut, prompting Osaki to notify upper management that he felt the cuts would be harmful to the SVP clients, in part because of the volume and complexity of the SVP cases.

171.   On April 8, 2014, Osaki drafted a memorandum to the Assistant Public Defender, Division Chief, and the Head Deputy of the SVP unit regarding the decision to reduce SVP staffing. Osaki wrote: "At this time, the SVP unit has approximately 170 cases in total. The proposal to reduce the Branch to 10 lawyers would result in approximately a 100% increase in caseloads and the difficult task of reassigning roughly 85 indeterminate cases.  On average, an individual case may have five banker's boxes worth of materials. If eight to nine cases are on average reassigned, the new lawyer will have to process 40 to 50 boxes worth of material. Based on my experience in handling SVP cases, I believe the workload that is expected to be taken on by the 10 lawyers to be concerning.  The lawyer will obviously be less efficient in handling their cases but most importantly the

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

competency of their practice may be challenged. In other words, no lawyer can be competent with such an added workload in such a short period of time."

172.   In his memorandum, Osaki went on to describe to his superiors the complexities of the SVP practice and how SVP cases differ from criminal cases:

"First, unlike a criminal case, we do not decrease our caseloads upon completing a trial (unless we win). In SVP, we have a continuing obligation to represent the client even after we lose at trial. After we lose a trial, in a year the burden shifts to the client to prove by a preponderance of the evidence that he is no longer an SVP.  Second, unlike a criminal case where one is litigating an incident(s) fixed in time, in SVP, the lawyer must stay abreast of the ever-changing nature of the law, the science of diagnosis and the science of risk assessment. In addition, since the focus of the inquiry in SVP cases is whether the individual client is currently an SVP, the lawyer must constantly reassess their cases in light of new science, age, additional treatment, release plans, etc.  Third, the lawyer must be adept in not only criminal law issues, but also be adept in SVP law, some juvenile law, some administrative law and the Code of Civil Procedure.  Finally, the SVP practice has changed dramatically since 2010. The number of scientific journal articles has increased dramatically in recent years. These journal articles cause lawyers to reassess their cases. Recent case law affecting the practice has also caused attorneys to reassess their cases. Most importantly, when our Branch expanded to twenty lawyers, the vast majority of our cases were 2- year cases. Now the vast majority of our cases are indeterminate and obviously more likely to draw appellate review."

Osaki concluded his memorandum with three proposals to reduce staffing more gradually.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

173.   At the same time, the attorneys in the SVP unit had expressed to Osaki feeling overwhelmed by the effects of the staffing cuts. Osaki testified that after he drafted his April 8, 2014, memorandum to upper management, the unit held a staff meeting at which Osaki informed the SVP attorneys of his memorandum and that it had gone unanswered by upper management of the Public Defender's Office. Osaki recalled that the staff attorneys then conducted an impromptu meeting themselves to consider drafting a letter to the SVP management, and they instructed Osaki and the unit's head deputy not to attend "because they wanted this letter to be from them and not us."  The letter drafted by the attorneys of the SVP unit and sent to Defendant Public Defender Ronald L. Brown on April 24, 2014, addressed the staff reduction in the unit.  The letter reiterated the same complexities of SVP law and analogized SVP law to capital litigation, stating: "The measure of our productivity cannot be judged by looking at the numbers of filings and trials. Akin to capital litigation, we win when we avoid trial." The attorneys asked that the Public Defender reconsider his decision to reduce the staff of the unit.  Osaki did not see the April 24, 2014, attorneys' letter until after it was drafted and sent to the Public Defender, Defendant Ronald Brown.

174.   Santiago also testified that he was one of at least 10 other deputy public defenders who drafted the April 24, 2014, letter to the Public Defender, Defendant Ronald Brown, which was hand-delivered to defendant Brown's office by a fellow deputy. That deputy received a voicemail from defendant Ronald Brown, which was played on speakerphone for other deputies to hear, in which he acknowledged receipt of the letter and that he was going forward with the staffing cuts, but he would perhaps readdress the second round of cuts that fall.  He did not.

175.   Defendant Suzuki testified that it was his understanding that in 2014, the unit had 20 attorneys and 120 pending cases, and that the staffing decrease to 15 or 10 attorneys still would allow the unit to adequately represent those 120 clients.  Mr. Suzuki was present during informal discussions with other division chiefs, including

FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1    the SVP unit supervisor, where Osaki's concerns following the staffing cuts were

2    addressed, which resulted in another reassessment of the SVP case load.  As a result

3    of that assessment following the staffing cuts, the office concluded "that the workload

4    was reasonable."   It was not.  The SVP caseload was overwhelming the SVP unit

5    attorneys and cases such as Mr. Williams case continued to linger without meaningful

6    attention and with no hope of being brought trial within a reasonable time.

7         176.   Santiago testified that in 2014, it was a well-known fact in the

8    courthouse that staffing cuts were ongoing and that "the Public Defenders were

9    delaying their cases, trying to keep up."  Santiago was present at various

10   conversations with Judge Elaine Mandel, Judge James Bianco, and the Public

11   Defender's Office, where the office informed the court of the problems with caseloads

12   and staffing, and that the understaffing was creating great delays in the processing of

13   the SVP cases.

14        177.   On August 21, 2014, Osaki drafted a second memorandum to the

15   Division Chief and the Head Deputy assessing the impact of the first SVP staff

16   reduction.  In a section of that memorandum, Osaki offered an example to upper

17   management where an attorney's case load increasing from nine cases to ten cases

18   disproportionately increases the attorney's workload in order to exemplify for upper

19   management that trial statistics alone were insufficient to determine whether their

20   clients were effectively being represented.  In the August 2014 memorandum, Osaki

21   wrote that the staffing cuts had placed the SVP branch in an untenable situation of

22   being ineffective and that further cuts could lead to civil liability.  He noted that he

23   feared that these cuts had purposefully implicated the SVP clients' federal

24   constitutional right to counsel.

25        178.   After the first round of staffing cuts and in anticipation of the second

26   round, the attorneys of the SVP unit wrote a letter, dated September 4, 2014, to the

27   Los Angeles County Board of Supervisors to express their concern about the

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    "improvident management decisions made by Mr. Brown and his close advisors."
2    The SVP attorneys noted that they were writing to the Board of Supervisors because
3    their concerns to Ronald Brown and the executive management had fallen on deaf
4    ears to the detriment of their clients and the County.

5    179.   On September 24, 2014, the attorneys also wrote to the State Bar of
6    California with a complaint against both the Public Defender and the Assistant Public
7    Defender for "jeopardizing the representation of [their] clients in the Public
8    Defender's Office and placing the lawyers in the untenable position of either being
9    IAC [ineffective assistance of counsel] or effectively abandoning their clients."

10    180.   After Osaki's two memoranda were forwarded to upper management in
11    April and August of 2014, staffing cuts continued in the SVP unit.  Santiago testified
12    that he felt he had no choice but to "go straight to the top" with the unit's concerns
13    with the staff cuts.

14    181.   Santiago testified during both Mr. DeCasas' underlying *Litmon/Vasquez*
15    proceedings and Mr. Frazier's Litmon/Vasquez proceedings that he was also involved
16    in drafting letters to the Board of Supervisors and to the State Bar of California.

17    182.   Santiago also testified that he was concerned for his position in the PD's
18    office because he had been retaliated against in the past for speaking out against the
19    staff cuts.  Osaki and another deputy public defender also testified that they were
20    retaliated against for speaking out against the staffing cuts.

21    183.   A deputy public defender in the *Frazier* matter testified in the underlying
22    *Litmon/Vasquez* proceedings for that matter that the receipt of additional cases due to
23    the staff cuts interfered with her ability to prepare Mr. Frazier's case for trial, as well
24    as her other clients, and also that it had an effect on the other attorneys in the SVP
25    Unit and their ability to adequately represent their clients.

26    184.   In February 2015, Santiago attended a live question-and-answer session
27    with Defendant Ronald Brown.  A microphone was passed around for direct

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    questions and anonymous questions were drawn from a hat due to the atmosphere of

2    fear, Santiago testified.  A number of senior management members of the Public

3    Defender's Office, including Defendants Kelly Emling, Laura Green, Michael Suzuki,

4    Jenny Brown, Daniel Kuperberg and Ruben Marquez were also present.  Santiago

5    stood up and asked Defendant Ronald Brown about how the staffing cuts were

6    affecting his clients. Santiago described Defendant Ronald Brown's response as

7    defensive and flippant: "He joked that our caseloads were doubled from one to two

8    which was patently false. He disagreed with my assessment of the fiscal impact of his

9    decision to make cuts. He described our caseloads as artificially low which also

10   seemed to indicate that he had no idea what he was talking about. And I think he

11   started to grow frustrated and angry because that was the last question that he

12   answered that day."

13       185.   In sum, from the filing of the Petition in 2008 through Appointed

14   Counsel's announcement of his intention to file a Motion to Dismiss in 2019, Mr.

15   Williams never once personally waived his right to a speedy trial, other than when his

16   attorneys and/or a judge requested Mr. Williams do so because his public defender

17   attorney stated he or she was not prepared to go to trial on Mr. Williams' case.  As

18   stated above, Mr. Williams was presented with the proverbial Hobson's Choice of

19   having unprepared counsel represent him or waiving time.  After the first round of

20   staffing cuts within the SVP unit, Mr. Williams's case was set for trial only once and

21   that was continued as a result of the transfer of his public defender attorney.

**E.**

**Special allegations regarding the Board of Supervisor Defendants.**

24       186.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl

25   (hereafter "BOS Defendants") are sued herein as members of the Los Angeles County

26   Board of Supervisors and as administrators, managers and supervisors of the Los

27   Angeles County Public Defender's Office.  At all times relevant hereto, and

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

beginning on or about March 2014, these defendants individually received letters and memoranda from Craig Osaki, an attorney from the SVP Unit of the PD's Office, and at least three letters from groups of attorneys from the SVP Unit which informed each of these defendants of the SVP Unit's inability to competently process and manage the SVP cases in the unit, including Mr. Williams's case.  These letters and memoranda were addressed separately to each of the BOS Defendants and were hand-delivered to their offices.  These memoranda and letters also informed these defendants that the inability to competently manage the SVP cases was causing

187.   The Los Angeles County Public Defender's Office is a Department of Los Angeles County.  *See, List of Los Angeles County Departments* https://www.lacounty.gov/government/departments-commissions-related-agencies/county-departments-and-principal-administration/.

188.    The Public Defender is appointed by the Los Angeles County Board of Supervisors and reports directly to the Board of Supervisors.  *See*, *Los Angeles County Charter, Article IV, Section 14.*

189.   The Board of Supervisors fulfills the executive, legislative and quasi-judicial powers in Los Angeles County government.  In its executive capacity, the supervisors are required to administer and supervise all government services, including the activities of the Public Defender's Office and its administrators.  *See, Id.*, *Responsibilities of the Board of Supervisors at*: http://file.lacounty.gov/SDSInter/lac/1031549_BoardResponsibilities.pdf.

190.   At all times relevant hereto, the BOS Defendants were members of the Los Angeles County Board of Supervisors with direct oversight and supervisory duties over Law Offices of the Los Angeles County Public Defender.

191.   The BOS Defendants were regularly made aware of the great delays in the processing of the SVP cases, including Mr. Williams case.  This notification came

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

by way of the regular meetings that they had with the administrators of the PD's Office and its SVP unit.

192.   Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez also individually met monthly, and often times more regularly, with defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl to discuss and carry out the operation and management of the PD's Office.  These meetings included discussions the PD's office's SVP Unit, its case load, individual cases handled by said unit - including Mr. Williams's case, the backlog of work in the SVP unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained as the awaited trial. Defendant Ronald Brown regularly provided defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl with memoranda, emails, reports, minutes of expanded meetings, case summaries, case management statistics and other written correspondence and documents regarding the management and operation of the SVP Unit.

193.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out their oversight of said office, they had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with the consent of Hilda Solis.

194.   These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. Williams's case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.  The BOS defendants individually requested and received regular memoranda, emails, reports, budget requests, and

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office regarding the management and operation of the SVP Unit, including the status of the civil detention proceedings of Mr. Williams. The BOS defendants had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. Williams's civil rights.   As such, the BOS defendants were aware of the present plaintiff's SVP case, the long delay in getting his case to trial, and the unconstitutional customs and practices which caused the delays in getting Plaintiff's case to trial and the violation of his civil rights.

195.   The BOS Defendants also each received written letters, memoranda, emails and other correspondence from the administrators of the Public Defender's office and from the attorneys in the SVP Unit informing them:

a.   of the great delays in the processing of the SVP cases, including the great delay in the processing of Mr. Williams's case;

b.   of the violation of the speeding trial rights and due process rights of the SVP clients, including Mr. Williams;

c.   that Mr. Williams was being ineffectively represented and that, as a result, the SVP attorneys were at risk of being sanctioned by the state bar; and,

d.   that continued violation of Mr. Williams's constitutional rights to counsel and due process were creating great civil liability for the County of Los Angeles and the BOS defendants.

196.   Despite actual notice of the ongoing and persistent violation of the civil rights of the SVP clients, the BOS Defendants took no meaningful steps, measures or actions during their tenure as members of the Los Angeles County Board of

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  Supervisors to address these constitutional violations, including the ongoing

2  violations of Mr. Williams's constitutional rights.

3       197.   Each of the BOS defendants, as a supervisor with direct authority over

4  The Law Offices of the Los Angeles County Public Defender, had the authority to

5  order Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki,

6  Daniel Kuperberg and Ruben Marquez to take specific actions regarding the

7  management of Mr. Williams's case.

8       198.   Although they had the authority to do the following so as to prevent the

9  violation of Mr. Williams's civil rights, BOS Defendants failed to do the following

10  during the 13 years of Mr. Williams's detention:

11       a.   Order that the Public Defender attorneys prepare his case, request a trial,

12           and proceed promptly to trial;

13       b.   Order that his case be given priority for trial over those of other SVP

14           detainees who had been waiting for trial for significantly shorter time

15           periods,

16       c.   Order that his case be transferred to appointed counsel for handling and

17           trial;

18       d.   Order that a conflict be declared so as to have the case transferred to

19           conflict counsel to proceed with Mr. Williams's case;

20       e.   Adhere to the State Bar guidelines for the provision of indigent legal

21           defense services, specifically failing to monitor the caseloads of the

22           Public Defender attorneys that were representing Mr. Williams; and,

23       f.   Implement internal measures in the SVP Unit to ensure that Mr.

24           Williams get to trial promptly.

25  ///

26  ///

27  ///

28

84

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## F.

### Special Allegations Regarding Notice of Constitutional Violations to Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez and BOS Defendants

199.   In early 2014, despite having a monumental backlog of SVP cases, despite the SVP unit's inability to bring many cases to trial on an annual basis, despite the SVP unit's attorneys having an insurmountable workload, and despite having the majority of their SVP cases having an average age of seven to ten years, defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez decided to cut the size of the SVP unit by 50 percent.  They knew that by doing so the delays in getting the SVP cases to trial would be exacerbated.   Once they presented their proposal to the SVP attorneys at various meetings in March and April of 2014, the SVP attorneys strongly voiced their opposition and emphasized to said defendants that their workload would become so oppressive that they would not be able to competently represent their SVP clients, that their SVP clients' constitutional rights would be violated, that they would become subject to claims of ineffective assistance of counsel and that they would be at risk of being disciplined by the state bar.

200.    The SVP attorneys wrote memoranda and letters to defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez during March, April and August of 2014 and in Auto memorialize the above concerns officially.  Said defendants read the letters and memoranda, acknowledged the concerns, but refused to take the concerns into account and went ahead with the staff reductions.

201.   Despite their fear for retaliation, the SVP attorneys wrote to their supervisors and candidly expressed their concerns and gave concrete examples of the

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

impact that the staff reductions would have on their already overburdened ability to represent their SVP clients.  For example, the supervising attorney for the SVP unit wrote the following to these defendants in his letter of April 8, 2014:

"At this time, the SVP unit has approximately 170 cases in total. The proposal to reduce the Branch to 10 lawyers would result in approximately a 100% increase in caseloads and the difficult task of reassigning roughly 85 indeterminate cases.  On average, an individual case may have five banker boxes work of materials.  If 8-9 cases are on average reassigned, the new lawyer will have to process 40-50 boxes worth of material.  Based on my experience in handling SVP cases, I believe the workload that is expected to be taken on by the 10 lawyers to be concerning.  The lawyer will obviously be less efficient in handling their cases but most importantly the competency of their practice may be challenged.  In other words, no lawyer can be competent with such an added workload I such a short period of time."

202.   The letter was accompanied by a proposal to reduce staffing more gradually so as to permit the SVP attorneys to competently handle the volume of cases.  The concerns and the proposal were ignored and rejected by Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.

203.   In a subsequent letter, the supervising attorney of the SVP unit wrote in an August 21, 2014, memorandum that staffing cuts "have placed the SVP branch in an untenable situation of being ineffective and further cuts could lead to liability," purposefully implicating the federal constitutional rights to counsel.

204.   In September of 2014 and in June of 2015, the SVP attorneys wrote similar letters and memoranda to the BOS defendants.  The letters and memoranda were sent anonymously for fear of retaliation. The letters and memoranda were hand-

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

delivered to the respective offices of each BOS defendant.  Each of the BOS defendants read these letters and memoranda and discussed them with Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.  The concerns expressed in the letters and memoranda were acknowledged by Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez and the concerns and concrete examples of the likely results of the staff cuts were ignored and rejected by the BOS defendants without meaningful inquiry or investigation. The staff cuts were agreed to by the BOS defendants and Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.

205.   Once the staff reductions were implemented, Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez met in February of 2015 with the SVP attorneys to evaluate the impact of the staff reductions.  These defendants were directly informed by the staff attorneys of the great backlog of cases, the burden of the overwhelming work related to the cases, and of the staff's inability to bring cases to trial.  They were told that the staff was essentially just continuing cases in an effort to catch up.  One staff attorney asked Ronald Brown if he had any idea how serious the impact of the staff reductions was.  Ronald Brown mocked the question and joked that the caseloads were artificially low.

206.   As for Mr. Williams, after the staff cuts were implemented, there were approximately 25 continuances of his case between 2015 and 2019.  Neither before nor after the staff cuts did Mr. Williams ever once waive his right to a speedy trial.

207.   The staff attorneys also wrote to the state bar and accused Ronald Brown of repeatedly violating rule 3-110(A) of the Rules of Professional Conduct by failing to ensure that the lawyers have appropriate resources so that they would be able to

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

competently represent their clients.  This rule provided that "a member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence."

## G.

### Special Allegations Regarding Concealment of Conflict of Interest

208.   On November 4, 2019, eleven (11) months after DPD3 was assigned to Mr. Williams's case, DPD3 declared a conflict of interest.

209.   By that point, however, the conflict of interest had existed for at least 11 years and it was deliberately concealed from Mr. Williams.

210.   The conflict of interest was created by the great delay in bringing his case to trial.  Due to this great delay, Mr. Williams was entitled to raise the delay, and resulting denial of his due process and speedy trial rights through a motion under *People v. Litmon* (2004) 123 Cal. App. 4, 1156 (*Litmon I*) and *People v Litmon*, (2008) 162 Cal. App. 4th 383 (*Litmon II*).  Under *Litmon*, Mr. Williams motion could have been brought successfully by 2009 – he had been in custody then for more than a year.

211.   The PD's Office could not raise the *Litmon* issue on Mr. Williams's behalf, however, because the lawyers and administrators from that office were the cause of the delay.  As such, by 2019, when the PD's Office finally declared a conflict of interest, that office had been in a factual, ethical and constitutional conflict of interest for at least 11 years.

212.   Instead, during the majority of the time that the PD's Office represented Mr. Williams, the administrators from the PD's Office, defendants Ronald Brown, Kelly Emling, Michael Suzuki, Jenny Brown, Laura Green, Daniel Kuperberg and Ruben Marquez, deliberately concealed from Mr. Williams that he had the right to raise the *Litmon* issue against them.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

213.   As early as 2014, each one of these defendants discussed this conflict of interest with Mark Ridley-Thomas, with Hilda Solis and with Sheila Khuel separately and informed them that a failure to declare the conflict of interest would result in civil liability.  All of these defendants agreed amongst themselves that they would not raise the *Litmon* conflict of interest with the clients or with the court and that they would not "declare unavailability" with the court so as to avoid being replaced as attorney for Mr. Williams.   By doing so, they agreed that they would be able to conceal the conflict of interest and avoid civil liability.   This included an agreement amongst themselves that they would strenuously fight any effort to remove the PD's Office as counsel for their SVP clients through *Marsden* motions.

214.   As agreed, for example, they fought *Marsden* motions in *People v. Rodrigo DeCasas* and in *People v. Darryell Frazier*.  In the present matter, even when urged by the court to file a *Litmon* motion, counsel for Mr. Williams – DPD3 – indicated she was "restrained."

215.   The defendants' plan was foiled and frustrated in April of 2015 when SVP clients Gaspar Zavala convinced the trial court in his cases to dismiss the PD's Office as his counsel and to appoint private counsel to represent him.  New counsel was appointed, and a *Litmon* motion was promptly filed which resulted in the dismissal of Mr. Zavala's case under *Litmon*.  Likewise, on December 22, 2016, another SVP client from the PD's Office, George Vasquez, was granted *Marsden* relief.  Shortly thereafter, a Litmon motion was filed for Mr. Vasquez and his case was also dismissed.  Defendant County of Los Angeles, however, appealed the dismissal of the *Vasquez* case.  The Court of Appeal of the State of California affirmed the dismissal and published its landmark case, *People v. Superior Court (Vasquez)*, (2018) 27 Cal. App. 5th 36, which found that the breakdown of the Los Angeles County public defender system was the cause of the denial of Mr. Vasquez's

89

1    due process and speedy trial rights. *Id* at 74.[3]  As noted above, another SVP client

2    from the PD's Office, Rodrigo DeCasas, filed a *Litmon/Vasquez* motion following the

3    Public Defender's Office declaring a conflict.  His case was also dismissed and was

4    subsequently appealed.  The Court of Appeal of the State of California, however,

5    affirmed the dismissal and published the case, finding that Mr. DeCasas's due process

6    and speedy trial rights were violated because of the breakdown of the Los Angeles

7    County public defender system.

8

9                                            **H.**

10                 **Special Allegations regarding Defendant Ricardo Garcia**

11          216.   Ricardo Garcia was appointed public defender of the County of Los

12   Angeles in October 2018.  As noted above, during the appointment process, he

13   learned that one of the most pressing issues at the Public Defender's Office was its

14   inability to get a large number of SVP cases to trial.  Before being appointed, he

15   learned through personal research and conversations with persons within the PD's

16   office that two significant cases had already been dismissed and the PD's office had

17   been found to have violated the clients' due process and speedy trial rights because of

18   various systemic failures in the SVP unit.

19          217.    Upon his appointment as the Public Defender, Ricardo Garcia inquired

20   about the SVP Unit and the delays in getting clients to trial.  He was informed that:

21          a.      there were nearly 200 SVP cases which were older than five years, and

22                  that there were a large number of SVP cases which were older than 10 years,

23

24

25

_____

26   [3] The Court in *DeCasas* echoed the *Vasquez* findings and also found that Mr.
     DeCasas's due process and speedy trial rights were violated because of the
27   breakdown of the Los Angeles County public defender system. *People v. DeCasas*,
     2020 Cal. App. LEXIS 879, 43-44.
28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

b.     the primary cause of the delay in getting the cases to trial was the serial substitution of attorneys which was caused by an excessive number of cases being assigned to the SVP unit attorneys,

c.     that the delay in getting these cases to trial was violating the constitutional rights of their SVP clients,

d.     that the delays and the resulting constitutional violations were creating a large civil liability for the PD's office, it's administrators and the County of Los Angeles,

e.     that under *People v. Litmon* (2004) 123 Cal. App. 4, 1156 (*Litmon I*) and *People v Litmon*, (2008) 162 Cal. App. 4th 383 (*Litmon II*), the PD's office was in a conflict with each of the various SVP clients whose cases were older than three years and had not been brought to trial because of the delays occasioned by the inability of the PD's office to get them to trial, and,

d.     that Mr. Williams had repeatedly demanded a trial and that he had filed various Marsden motions asking the PD's office to be relieved as counsel.

218.   Shortly before his appointment, the decision in *People v. Superior Court (Vasquez)*, (2018) 27 Cal.App.5th 36 was published.  The opinion was critical of the Public Defender's failure to get the SVP cases to trial.

219.   Thereafter, he learned of the federal civil action against the PD's office brought by former SVP client Gaspar Zavala in August 2018 which alleged the various deficiencies, systemic failings and unconstitutional practices which Ricardo Garcia had earlier been apprised of as being the cause of the delays in getting SVP cases to trial.

220.   Ricardo Garcia inquired as to the status of Mr. Williams' case and was informed that the PD's office was in conflict with Mr. Williams because of the great delay in getting his case to trial.  Ricardo Garcia and the other Administrator Defendants devised a plan to conceal their conflict of interest under *Litmon* and

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

*Vasquez*, to conceal the violation of Mr. Williams' constitutional right to a speedy trial and to avoid civil liability.  The replaced DPD2 with DPD3, a senior SVP attorney, and instructed her to push the case to trial.  When DPD3 took over Mr. Williams' case, she learned that the PD's Office had improperly allowed the prosecution to use Mr. Williams' juvenile records in the SVP proceedings.  She informed Ricardo Garcia and the other Administrator Defendants about this inexcusable failing and that had they objected to the use of the juvenile records initially at the probable cause hearing the SVP proceedings against Mr. Williams would have been dismissed.

221.    DPD3 also informed Ricardo Garcia and the other Administrator Defendants that absent the use of the juvenile records by the prosecution experts at that point, Mr. Williams would not be in SVP proceedings.

222.    Mr. Williams continued to complain to the court about the failure to move his case and to get it to trial and he continued to file motions to have the PD's office removed.  DPD3 was instructed by Ricardo Garcia and the other Administrator Defendants to challenge the *Marsden* motions and to reassure the court that the PD's Office was moving things along.

223.    In late 2018 and early 2019, DPD3 discussed with Ricardo Garcia and the other Administrator Defendants that she believed that the PD's Office was in conflict with Mr. Williams.  She explained that she under *Litmon* and *Vasquez*, Mr. Williams had a viable motion to dismiss which would likely be granted if the motion were made.  She was instructed by Ricardo Garcia and the other Administrator Defendants to refrain from filing a *Litmon/Vasquez* motion, specifically telling her not to file a *Litmon/Vasquez* motion.

224.    Ultimately, these reassurances DPD3 made to the court fell upon deaf ears and the court on February 25, 2019, during the proceedings related to a Motion for Replacement of Counsel filed by Mr. Williams, DPD3 was ordered by the court to

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

file a *Litmon-Vasquez* motion to dismiss the SVP proceedings against Mr. Williams based on delay in getting the case to trial.  DPD3 responded to the court that she could not file said motion to dismiss because it would be a conflict for her to accuse her own colleagues at the PD's office and PD's office of unconstitutional delay.  The court admonished DPD3 that she had a "duty to litigate for [her] client."  DPD3 acknowledged the court's conclusion regarding her duty to Mr. Williams and responded that her office would not allow her to file such a motion. DPD3 responded, "I do, but I am restrained." The court reminded DPD3 that her office's policies could not override her ethical duties to Mr. Williams.

225.   DPD3 reported to Ricardo Garcia and the other Administrator Defendants the court's insistence that she file a *Litmon/Vasquez* motion.   Ricardo Garcia and the other Administrator Defendants urged DPD3 to continue to delay the case and to, instead, file a motion to have preclude the use of Mr. Williams' juvenile records and to have new evaluations ordered.  DPD3 told Ricardo Garcia and the other Administrator Defendants that this would cause further delay, that such a motion would bring to light the PD's prior failure to raise this issue in a timely fashion, that she, the PD's office and the Administrator Defendants were in conflict with Mr. Williams and that a Litmon/Vasquez motion to dismiss for delay was necessary at that point – especially given the court's insistence that such a motion be filed.

226.   Ricardo Garcia and the other Administrator Defendants continued to monitor Mr. William's case and received regular written, telephone and in-person reports from DPD3. The law-and-motion proceedings to have Mr. Williams' juvenile records expunged and to have new evaluations performed resulted in significant disclosures which revealed that had the use of the juvenile records been challenged in a timely fashion, the SVP proceedings against Mr. Williams would have been dismissed as early as the initial probable cause proceedings.  Ultimately, DPD3

93

1    continued to raise the issue of the clear and apparent conflict of interest that she, her

2    office and the Administrator Defendants had with Mr. Williams.  As the proceedings

3    to challenge the use of the juvenile records continued forward, Ricardo Garcia and

4    the other Administrator Defendants concluded that they could no longer delay Mr.

5    Williams' case because of the clear and apparent conflict, and they ordered DPD3 to

6    declare the conflict that she had informed them of in late 2018.

7         227.   In November of 2019, DPD3 declared a conflict and private counsel was

8    appointed for Mr. Williams.   By that time, Ricardo Garcia had overseen the defense

9    of Mr. Williams case for approximately 13 months.  His failure to declare a conflict

10    in Mr. Williams' case, his failure to declare his office unavailable in Mr. Williams'

11    case, and his attempts to conceal the failings of the PD's Office by instructing DPD3

12    to refrain from declaring a conflict and to refrain from filing a *Litmon/Vasquez*

13    motion caused Mr. Williams to be detained wrongfully and unconstitutionally for one

14    year.

## VI.

## FIRST CLAIM FOR RELIEF

**DELIBERATE INDIFFERENCE CAUSING VIOLATION OF CONSTITUTIONAL RIGHTS, AS TO DEFENDANTS RICARDO GARCIA, RONALD BROWN, JENNY BROWN, KELLY EMLING, LAURA GREEN, MICHAEL SUZUKI, DANIEL KUPERBERG, RUBEN MARQUEZ, MARK RIDLEY-THOMAS, HILDA SOLIS, SHEILA KUEHL AND DOES 1 THROUGH 10**

23         228.   Plaintiff Corey Williams repeats and realleges each and every allegation

24    above as though fully set forth herein.

25         229.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Mr.

26    Williams's rights under Sixth Amendment and Fourteenth Amendment of the U.S.

27

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  Constitution to a speedy trial, to counsel, and to due process and substantive due
2  process.

3      230.   Defendants Ricardo Garcia, Ronald Brown, Kelly Emling, Laura Green,
4  Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez, BOS
5  Defendants and DOES 1 through 10 are sued herein as administrators of The Law
6  Offices of the Los Angeles County Public Defender and its SVP Unit.   Defendants
7  Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel
8  Kuperberg and Ruben Marquez did not represent Corey Williams as a trial attorney in
9  any of the underlying SVP commitment proceedings, and they did not appear as
10  counsel for Plaintiff in any of the underly SVP proceedings.  As such, liability against
11  these defendants is not based on these defendants acting within the scope of legal
12  representation of Mr. Williams.

13      231.   Plaintiff is informed and believes, and thereon alleges, that The Law
14  Offices of the Los Angeles County Public Defender, its SVP Unit, Ricardo Garcia
15  Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel
16  Kuperberg and Ruben Marquez, the BOS Defendants, and DOES 1 through 10 failed
17  to timely bring Mr. Williams's case to trial.  By thus abandoning the present plaintiff,
18  said defendants allowed the present plaintiff to be held as a pre-trial detainee for such
19  inordinately long period of time that his due process rights and his rights to a speedy
20  trial were violated.

21      232.   As a direct result of the deliberate indifference of the present defendants,
22  plaintiff Corey Williams spent 13 years waiting for his case to come to trial.  It never
23  did because of the due process violations alleged herein above.

24      233.   On or before Mr. Williams's underlying case/petition was dismissed,
25  there existed within the Public Defender's Office and its SVP Unit various customs
26  and practices which caused a systemic breakdown within the PD's office.  The result
27  of this systemic breakdown was that the cases in the SVP unit, including Mr.

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Williams' case, were caused to be inordinately delayed to a point that the constitutional rights of SVP clients to a speedy trial were violated.

234.   The systemic breakdown within the PD's office and the resulting delay of Mr. Williams' case being brought to trial, caused Mr. Williams to unnecessarily spend years as a pre-trial detainee waiting for his case to be brought to trial.

235.   These unreasonable and unconstitutional delays in the bringing to trial of the SVP cases were the result of several unconstitutional customs and practices which existed within The Public Defender's Office and its SVP Unit and which the present defendants were aware of and which said defendants ratified.  These customs and practices included:

a.   Waiving or failing to challenge evidence at probable cause at the initiation of SVP proceedings;

b.   Failing to investigate all meaningful defenses to SVP proceedings;

c.   Failing to timely challenge the use of juvenile records and criminal history by the prosecution and prosecution's experts;

d.   Failing to advise clients of the PD's Office during their underlying criminal matters that accepting a plea offered by the District Attorney may result in subjecting them to the provisions of the SVP Act and, as such, a lengthy if not indefinite pre-trial confinement, and indeterminate civil commitment in a California State Hospital;

e.   Failing to regularly bring SVP detainees to court for hearings, or to otherwise ensure that SVP detainees were in court or that they would appear by video conference, so as to conceal from SVP detainees their delays in processing their cases in a timely manner;

f.   Failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, and the likelihood of success of their efforts;

96

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

g.    Failing to obtain consent from SVP client/detainees to continue hearing dates, trials dates as well as other deadlines which were in their control;

h.    Waiving of SVP client/detainees' appearance at hearings without securing their authority to do so;

i.    Agreeing to repeated continuances sought by the prosecution and/or seeking continuances without their clients' consent;

j.    Ignoring requests from SVP clients/detainees to bring their case to trial promptly;

k.    Failing to meet reasonable deadlines in SVP cases;

l.    Failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;

m.    Allowing experts' reports to lapse or otherwise go stale;

n.    Concealing material facts from SVP clients/detainees;

o.    Concealing their misconduct from SVP clients/detainees;

p.    Failing to inform their clients of conflicts of interests;

q.    Failing to inform the court of conflicts of interest;

r.    Failing to bring cases to trial within the stipulated time period with the District Attorney's Office after the passage of Proposition 83;

e.    Failing to file oppositions to motions and other petitions by the prosecution;

f.    Allowing SVP cases to sit idle for years without meaningful progress;

g.    Failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;

h.    Tolerating a conflict of interest, in violation of state bar ethics rules and standards, and failing to declare such conflicts so as to permit their SVP

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

detainees to file *Litmon-Vasquez* motions after the extensive delays in the processing of their cases;

i.  After extensive delays on their part, failing to inform SVP detainees of their right to file a motion under *People v. Litmon* and *People v. Vasquez* for the violation of their constitutional rights;

j.  Refusing to declare an actual conflict upon learning of it;

k.  Failing to object to the use of hearsay evidence by the prosecution's experts;

l.  Waiving probable cause and/or submitting to evidence presented at probable cause without challenging said evidence at the initiation of the SVP proceedings, including failing to object to the evidence used at probable cause hearings as subject to hearsay or other exclusions; and, failing to raise viable defenses to the SVP allegations, including, but not limited to whether SVP detainees are subject to deportation;

m.  Concealing conflicts of interest from SVP clients and the court, and failing to declare a conflict of interest to allow appointed/private counsel to bring motions under *People v. Litmon* and *People v. Vasquez*; and,

n.  Failing to adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys.

236.  These customs and practices resulted in a systemic breakdown within the PD's office which caused the violation of Mr. Williams' right to a speedy trial.   The PD's office was so dysfunctional as a result of these practices and customs that a vast majority of the SVP case could not be brought to trial and the caseload for each of the deputy public defenders became so unmanageable that SVP cases, such as Mr. Williams' case, would not get the particularized attention that the case needed

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    causing these cases to linger unreasonably without being brought to trial.  This in

2    violation of the SVP clients' constitutional rights.

3         237.   Recently, the problem of persistent excessive caseloads in the PD's

4    office, including the SVP unit, was again brought to public attention when more than

5    300 members of the PD's, including current and former members of the SVP unit,

6    signed a letter pleading that the office go "unavailable".  *See, Exhibit 2*, Letter to

7    Ricardo Garcia, Public Defender, Dated February 2, 2022.   In their continuing

8    custom and practice of unconstitutional disregard for the speedy trial rights of their

9    clients, the present defendant refuse to declare "unavailability" so as to properly

10   provide effective assistance of counsel.  The signators to the letter wrote:

11        "Our office is in crisis. You must take immediate action to address

12        excessive workloads by going unavailable. Our attorneys have reached the

13        point where they can no longer continue to accept new cases while

14        continuing to provide effective representation to our clients. The problem

15        is only becoming more acute due to the increase in attorneys leaving the

16        office, as well as attorneys taking leave due to burnout caused by

17        unmanageable workloads."

18        238.   Both the trial court in Mr. Williams's case and the Court of Appeal of

19   the State of California in Mr. Vasquez's and Mr. DeCasas' cases have held that there

20   existed in the PD's Office an institutional systemic breakdown of the Public Defender

21   system in Los Angeles County during the time that Mr. Williams's case was being

22   handled by the PD's Office and that this system breakdown was the cause of the

23   violation of his constitutional rights.

24        239.   As noted above, Mr. Williams was not advised by the PD's Office

25   during his underlying criminal matter that accepting a plea offered by the District

26   Attorney may result in subjecting him to the provisions of the SVP Act and, as such,

27   a lengthy if not indefinite pre-trial confinement, and indeterminate civil commitment

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  in a California State Hospital.  As a result, Mr. Williams was forced into involuntary

2  civil pre-trial confinement for more than 13 years after he accepted said plea bargain

3  without the benefit of being advised that he may be subject an SVP petition filed

4  against him.

5       240.   As presented in detail above, the delays in bringing Mr. Williams case to

6  trial resulted from the systemic breakdown in the PD's Office which resulted from:

7      a.   A flaw in the public defender's mechanism for identifying and avoiding

8          conflicts of interest,

9      b.   A failure to train incoming SVP lawyers,

10      c.   An understaffed public defender office facing overwhelmingly heavy

11          caseload,

12      d.   A failure to timely challenge the use of juvenile records, and,

13      e.   Underdeveloped expert pool and a payment system which made it

14          difficult to promptly pay expert fees such that few experts were willing

15          to work for the public defender's office.

16       241.   Defendants Ricardo Garcia, Ronald Brown, Kelly Emling, Laura Green,

17  Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1

18  through 5 were aware of the inordinate and excessive delay that plaintiff and the other

19  SVP detainees were experiencing in the processing of their cases and that Plaintiff's

20  case and the other cases were not being brought to trial in a timely basis. Said

21  defendants were aware of the customs and practices described above that existed at

22  the SVP Unit and which were the causes of the failure to bring these cases to trial in a

23  timely fashion.

24       242.   Between 2006 and 2019, defendants Ricardo Garcia, Ronald Brown,

25  Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben

26  Marquez and DOES 1 through 5 learned of these delays in the processing of SVP

27  cases and of the causes of SVP cases not coming to trial in a timely basis through

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

their regular monitoring of the SVP Unit and the monitoring of the performance of the lawyers in that unit.  Said monitoring by defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 consisted of:

    a.    Monthly meetings with the supervisors of the SVP Unit,

    b.    Annual performance evaluations of the supervisors and staff of the SVP Unit,

    c.    Annual review of the status of each individual SVP case, the SVP Unit case load, the SVP Unit projections for staff needs and the expert needs conducted during the preparation of the SVP Unit budget for presentation to the Los Angeles County Board of Supervisors.

    d.    Monitoring of appeals brought on behalf of SVP detainees, including the review of appellate briefs regarding and the review of the outcome of such appeals (see e.g., *Arnold v. Superior Court*, (2014) unpublished opinion involving SVP defendant who was challenging an SVP mental health examination and noting critically that "… defendant was evaluated by the hospital's department in 2007. But as of September 2013, his case had not been tried.")

243.   The BOS Defendants and DOES 6 through 10 were informed of the above-mentioned dramatic trial delays in the SVP cases, including the delays in Plaintiff's case, and of the causes of the delays in the SVP cases coming to trial in a timely basis through their regular management, supervision and administration of the Public Defender's Office and through their monthly meetings with defendants Ricardo Garcia, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez.

244.   The BOS Defendants were responsible for monitoring, supervising and management of the performance of the Public Defender's Office.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

245. The BOS defendants regularly met with defendants Ricardo Garcia, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss the issues surrounding the performance of the Public Defender's Office, its SVP Unit and individual cases, including the present Plaintiff's SVP case.   As early as 2008, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez regularly discussed the significant delays in the processing of pending SVP cases with the BOS Defendants.  They informed the BOS Defendants of the significant backlog of work in the SVP Unit and of the great delays that were occurring in the bringing of these cases to trial.   As early as 2010, they informed the BOS Defendants of Mr. Williams, who was awaiting trial in his SVP case and informed the BOS Defendants of the number of years he had been waiting for trial.

246. As alleged above, attorneys from the SVP unit wrote memoranda and letters to the BOS Defendants after having their concerns ignored by their supervisors/administrators of the Public Defender's Office. The letters and memoranda specifically noted that the clients being served by the SVP Unit were suffering the violation of their speedy trial rights and their rights to counsel. Moreover, these letters and memoranda warned the BOS Defendants that these delays were creating civil liability for the County of Los Angeles.

247. The BOS defendants received and read these letters and memoranda. They met and conferred with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 10 to discuss the contents of the letters and memoranda, but failed to take any action to deal with, address, ameliorate or otherwise meaningfully respond to the concerns raised by the attorneys in the SVP unit.

248. Besides discussing the long delays in bringing the SVP cases to trial with the BOS Defendants, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   Michael Suzuki, Daniel Kuperberg and Ruben Marquez also regularly wrote emails,

2   memoranda, meeting summaries and other written documents to the BOS defendants

3   discussing the delay in the processing of Plaintiff's case.

4       249.   In the regular meetings, which were often monthly, between Ricardo

5   Garcia, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki,

6   Daniel Kuperberg and Ruben Marquez and DOES 1 through 10 from 2008 to 2020,

7   these defendants discussed the SVP Unit's significant backlog of cases which had not

8   reached trial in five years, ten years and, eventually, 20 years.   Annually, and often

9   quarterly, all these defendants collectively discussed with respect to the SVP trial

10  delays:

11      a.   Whether the delay in bringing these cases to trial violated the due

12           process rights and speedy trial rights of the detainees, including Mr.

13           Williams,

14      b.   The costs of bringing each case to trial;

15      c.   The reasons for the delays in bringing Mr. Williams's case to trial,

16      d.   The delays occasioned by the lapsing of the expert reports, including in

17           Mr. Williams's case,

18      e.   The repeated requests for continuances by the SVP lawyers and

19           prosecutors,

20      f.   Evaluating the need in each SVP case for a declaration of

21           "unavailability" so as to ensure that each such case was brought to trial,

22           including making such a declaration in Mr. Williams's case,

23      g.   Implementing internal measures in the SVP Unit to ensure that each SVP

24           case, including Mr. Williams's case, got to trial in a timely fashion, and,

25      h.   Requesting that the supervising judge of the criminal division assign a

26           specific judicial officer or courtroom for the exclusive handing of SVP

27           cases.

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

250.   During every year between 2006 and 2019, defendants Ricardo Garcia, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and/or DOES 1 through 5, were aware that the customs and practices in place in the SVP unit were resulting in a large number of SVP cases, including, from 2008 on the present plaintiff's case, not getting to trial in a timely fashion.  On a monthly basis during that time, said defendants learned of continuances of trial dates and other related dates which continued to extend the time in which the SVP cases would come to trial.  Notwithstanding this information, said defendants failed to abolish, revoke, rescind or otherwise put a stop to these customs and practices.  They failed to:

a.   Implement internal measures in the SVP Unit to advance or otherwise expedite the bringing of the SVP cases to trial,

b.   Prioritize the oldest SVP cases to ensure they would get to trial in an expedited fashion,

c.   Institute tighter controls over supervisors in the SVP Unit to ensure that they managed their subordinates in a fashion that ensured that the older SVP cases would get to trial promptly,

d.   Impose time limits for the bringing of SVP cases to trial,

e.   Establish and implement a policy, custom or practice whereby the PD's office would declare conflicts or declare "unavailability" in old SVP cases so as to ensure that the courts could appoint private counsel or counsel from the alternate public defender's office to bring SVP cases to trial, and,

f.   Establish a and implement a policy, custom or practice whereby the PD's office would declare conflicts of interest or declare "unavailability" in those older SVP cases that were subject to a *Litmon* motion so as to

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

permit the court to appoint private counsel to represent those detainees who had valid grounds to bring such motions.

251.   Despite knowing of the great magnitude of the delays in bringing Plaintiff's case to trial, defendants Ricardo Garcia, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez, the BOS Defendants and DOES 1 through 10 failed to take any reasonable measures to ensure that the constitutional rights of Mr. Williams were protected.  Such failure constituted deliberate indifference to the due process rights and the speedy trial rights of Mr. Williams.

252.   The BOS Defendants and DOES 1 through 5 knowingly refused to terminate the acts, customs, practices and misconduct of their subordinates, which they knew was causing and would cause constitutional injury upon the SVP detainees in their charge. Said defendants failed to take reasonable measures to institute internal measures within the SVP Unit to address the long delays in getting SVP cases to trial, they failed to institute new training of their subordinates in the management of SVP cases so as to ensure that SVP cases got to trial in a timely fashion, and they failed to discipline their subordinates for failing to get the SVP cases to trial in a timely fashion.

253.   All of these failures on the part of defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 constituted an acquiescence in, and ratification of, the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. Williams.

254.   Every year between 2008 and 2019, defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, through the

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1 | aforementioned management of the SVP Unit, were made aware of the extended
2 | delays in the SVP cases and of the resulting due process violations that the SVP
3 | detainees were suffering.

4 | 255.   Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl received separate in-
5 | person and written reports from defendants Ronald Brown, Jenny Brown, Emling,
6 | Laura Green, Suzuki, Kuperberg, Marquez and DOES 1 through 10 as to the great
7 | delays in bringing the SVP cases to trial.  Defendants Ronald Brown, Jenny Brown,
8 | Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and
9 | Sheila Kuehl and DOES 1 through 10 were responsible for the institution of internal
10 | measures within the SVP Unit to correct this unconstitutional condition but failed to
11 | do so. Such failure constituted deliberate indifference to the due process rights and
12 | the speedy trial rights of Mr. Williams.

13 | 256.   Defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Emling,
14 | Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila
15 | Kuehl and DOES 1 through 10 knowingly refused to terminate the customs, practices
16 | and misconduct of their subordinates, which they knew were causing and would
17 | continue to cause constitutional injury upon the SVP detainees, including Mr.
18 | Williams.  Said defendants had the authority to discipline supervisorial staff in the
19 | SVP Unit for failing to bring SVP cases to trial on a timely basis as well as failing to
20 | challenge the admission of unproven and inadmissible hearsay allegations at SVP
21 | proceedings, such as the prosecution's expert reports.  Said defendants failed to
22 | discipline their subordinates in the SVP Unit, and thereby ratified the great delays in
23 | the bringing the SVP cases to trial as well as ratified the failures to challenge
24 | evidence at the probable cause stage of SVP proceedings. Said defendants mandated
25 | that their subordinates not pursue any law and motion on behalf of their SVP clients,
26 | including Mr. Williams, that would result in the disclosure that the Public Defender's
27 | Office was failing its clients in its representation and that said failures resulted from a

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    systemic breakdown in the Public Defender's Office that included 50% reductions in

2    staff attorneys and support staff.

3           257.   As far back as 2007, defendants Ricardo Garcia, Ronald Brown, Jenny

4    Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda

5    Solis and Sheila Kuehl and DOES 1 through 10, by causing their subordinate

6    attorneys to be overburdened by massive caseloads due, in part, to staffing cuts, but

7    also due to attorneys in the SVP Unit having massive caseloads with few resources

8    even prior to the staffing cuts, forced their subordinate attorneys to decide to reject

9    otherwise colorable legal remedies, such as challenging the admission of inadmissible

10   evidence at the probable cause stage and pursuing legal remedies regarding motions

11   to dismiss on *Litmon-Vasquez* grounds.  Said legal remedies were rejected, in large

12   part, to avoid disclosing the constitutional violations the Public Defender's Office

13   was committing as well as to avoid disclosing the systemic breakdowns that played a

14   role in causing said constitutional violations.  The systemic breakdowns within the

15   Public Defender's Office caused resources throughout the entirety of the Public

16   Defender's Office to be stretched and strained to such a degree as to cause the Public

17   Defender's Office, particularly the SVP Unit, to have as a policy, custom and practice

18   that it would only pursue those legal remedies, including law and motion, that

19   protected the interests of the Public Defender's Office and not motions to dismiss,

20   such as *Litmon-Vasquez* motions, that did not protect or advance the Public

21   Defender's Office interests.  Said legal remedies, including motions to dismiss

22   challenging the SVP petitions on the ground that SVP detainees' due process rights

23   were violated, were uniformly rejected by the Public Defender's Office because the

24   Public Defender's Office did not have the resources to pursue said legal remedies and

25   would only pursue those that did not disclose the systemic dysfunction within the

26   Public Defender's Office.  The Public Defender's Office and its SVP Unit had, as a

27   policy, that it would use its limited resources to only pursue a limited category of

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

legal remedies and law and motion, which did not include motions to dismiss challenging SVP petitions on the ground that SVP detainees' due process rights were violated, such as Plaintiff Williams's, that may also disclose that the Public Defender's Office was failing its clients in its representation and that said failures resulted from a systemic breakdown in the Public Defender's Office that included 50% reductions in staff attorneys and support staff.  Failures to pursue said motions to dismiss to protect its own interests constituted deliberate indifference to the due process rights of Mr. Williams and other similarly situated SVP detainees.

258.   Moreover, said defendants were aware that its attorneys were failing to zealously defend the cases of dozens of its SVP detainee clients.  Said detainees were forced to be involuntarily confined in state hospitals for years, if not decades, while their appointed counsel from the Los Angeles County Public Defender's Office chose to deliberately delay the cases of said SVP detainees and never take their cases to trial or file motions to dismiss on their behalf.  Said SVP detainee clients were involuntarily confined while their counsel from the Public Defender's Office failed to consult experts or hire experts to challenge the evaluations of state evaluators.  Said SVP detainee clients were involuntarily confined as said defendants from the Public Defender's Office serially substituted attorneys representing the SVP detainees, resulting in new counsel needing to get up to speed on said cases and being unprepared to move the cases of their clients forward, resulting in the due process rights of said clients being violated.  Defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, made the decision not to bring to trial or file motions to dismiss on behalf of any of the Public Defender's Office's SVP clients.  As such, said defendants knew that they could not allow the SVP Unit to file any motions challenging the sufficiency of evidence, including the inadmissibility of hearsay evidence, presented at probable cause hearings.  Said

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

defendants knew they could not allow the SVP Unit file any motions to dismiss SVP petitions on the ground that their clients' due process rights had been violated. Said defendants' failures were causing SVP detainees to be confined in state hospitals without trial or motions to dismiss for years, if not decades, against the wishes and demands of their clients in the SVP Unit.  Said defendants were aware that if they agreed to challenge SVP petitions on due process grounds, then their SVP Unit would be forced to expose systemic dysfunction prevalent in the Public Defender's Office. Failures to pursue said law and motion and legal remedies to protect its own interests constituted deliberate indifference to the due process rights of Mr. Williams and other similarly situated SVP detainees.

259.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 6 through 10 failed to institute internal measures within the PD's Office and within its SVP Unit to address the long delays in getting SVP cases to trial, they failed to order or otherwise institute new training of their subordinates in the management of SVP cases so as to ensure that SVP cases got to trial in a timely fashion, and they failed to discipline, or order the discipling of, their subordinates, including defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, and Marquez, for failing to get the SVP cases to trial in a timely fashion. These failures on the part of defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 6 through 10 constituted an acquiescence in, and ratification of, the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. Williams.

260.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl were particularly indifferent to a tremendous degree in his disregard for the violation of the constitutional rights of the SVP detainees in general and of the violation of the constitutional rights of Mr. Williams specifically.  Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl forbade the Public Defender's Office and its supervisors

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

and administrators, including defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, and Marquez, from "declaring unavailability in Mr. Williams's case; that is, to declare to the court that the public defender's office is "unavailable" or unable to meet its obligations and duties to Mr. Williams and thereby have the court assign his case to another public defender agency (such as the Office of the Alternate Public Defender) or to a private panel attorney.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl refused to allow the PD's office to "declare unavailability" in Mr. Williams's case and in other SVP cases despite knowing the following:

    a.    That the SVP unit was significantly backlogged in the processing of SVP cases and that the majority of the SVP cases were years delayed in getting to trial and would continue to be so backlogged;

    b.    That the SVP Unit attorneys were excessively overworked with extremely heavy caseloads that could not be processed and brought to trial in a meaningful and effective way;

    c.    That the caseload for the SVP Unit was exacerbated by a 50% reduction in staff attorneys and administrative staff such as paralegals and investigators; and,

    d.    That less than 50% of the pending SVP cases would ever get to trial within 10 years.

261.    Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl knew that this exacerbated backlog of SVP cases would be efficiently and meaningfully processed to trial by having the PD's office "declare unavailability" in the older SVP cases, including Mr. Williams's case, so that the court could assign such cases to other agencies or panel attorneys for trial or other proceedings such as *Litmon* motions.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

262.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl forbade the declaration of "unavailability" in SVP cases, including Mr. Williams's, despite knowing that failing to do so would cause years of prolonged unconstitutional detention of SVP detainees such as the present plaintiff.

263.   As a result of the above deliberate acts and omissions of defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, Plaintiff was damaged and injured as alleged above by being made to endure a 13-year pre-trial detention which violated Mr. Williams's civil rights.

264.   The conduct of defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, as alleged above, was done with deliberate indifference to the constitutional violations endured by the present plaintiff.  As such, punitive damages should be imposed, in an amount sufficient to punish said defendants and to deter future similar conduct by said defendants and others in similar positions.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

# VII.

## SECOND CLAIM FOR RELIEF

**MUNICIPAL LIABILITY FOR VIOLATION OF CONSTITUTIONAL RIGHTS AS TO DEFENDANTS COUNTY OF LOS ANGELES AND LAW OFFICES OF THE LOS ANGELES COUNTY PUBLIC DEFENDER**

265.   PLAINTIFF repeats and realleges each and every allegation above as though fully set forth herein.

266.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiff's rights under the Fourteenth Amendment.

267.   Plaintiff's due process rights were violated by the 13-year delay in bringing his case to trial as alleged above in the first claim for relief.  As a result of the aforementioned acts and omissions of defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, plaintiff's Fourteenth Amendment due process rights were violated.

268.   At the time of these constitutional violations by said defendants, defendant County of Los Angeles and defendant Public Defender's Office had in place, and had ratified customs and practices which permitted and encouraged attorneys in the Public Defender's Office to delay bringing SVP cases to trial and which violated the due process right of their SVP clients, including Mr. Williams.

269.   These practices, customs, policies and procedures included:

a.   Preventing and restraining the attorneys in its SVP Unit from filing *Litmon-Vasquez* motions to dismiss, writs or other legal challenges of the SVP petitions filed against SVP clients/detainees on constitutional grounds because they are counter to the interests of the Public Defender's Office and would expose the systemic dysfunctions present

112

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

in the Public Defender's Office and the fact that the Public Defender's Office had violated the constitutional rights of their SVP client/detainees;

b.  Waiving or failing to challenge evidence at probable cause at the initiation of SVP proceedings;

c.  Failing to investigate all meaningful defenses to SVP proceedings;

d.  Failing to timely challenge the use of juvenile records and criminal history by the prosecution and prosecution's experts;

e.  Failing to regularly bring SVP detainees to court for hearings, or to otherwise ensure that SVP detainees were in court or that they would appear by video conference, so as to conceal from SVP detainees their delays in processing their cases in a timely manner;

f.  Failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, and the likelihood of success of their efforts;

g.  Failing to obtain consent from SVP client/detainees to continue hearing dates, trials dates as well as other deadlines which were in their control;

h.  Waiving of SVP client/detainees' appearance at hearings without securing their authority to do so and/or convincing SVP client/detainees to waive their appearance at hearings against their best interests;

i.  Continuing trial dates and other related dates without client consent and without clients waiving their rights to speedy trials and/or convincing SVP client/detainees to waive time for trial against their best interests;

j.  Agreeing to repeated continuances sought by the prosecution and/or seeking continuances without their clients' consent;

k.  Ignoring requests from SVP clients/detainees to bring their case to trial promptly;

l.   Failing to meet reasonable deadlines in SVP cases;

m.   Failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;

n.   ;

o.   Allowing experts' reports to lapse or otherwise go stale;

p.   ;

q.   Failing to inform their clients of conflicts of interests based on their failure to bring SVP cases to trial in timely and constitutional fashion;

r.   Failing to inform clients of their right to bring a motion to dismiss their case under *People v. Litmon (I and II)* and in *People v. Vasquez*;

s.   Failing to inform the court of conflicts of interest;

t.   ;

u.   ;

v.   Allowing SVP cases to sit idle for years without meaningful progress;

w.   Failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;

x.   Tolerating a conflict of interest, in violation of state bar ethics rules and standards, and failing to declare such conflicts so as to permit their SVP detainees to file Litmon-Vasquez motions after the extensive delays in the processing of their cases;

y.   After extensive delays on their part, failing to inform SVP detainees of their right to file a motion under *People v. Litmon* and *People v. Vasquez* for the violation of their constitutional rights;

z.   Refusing to declare an actual conflict upon learning of it;

aa.   Failing to object to and/or otherwise challenge the use of hearsay evidence by the prosecution's experts;

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

bb.     Waiving probable cause and/or stipulating to the use of evidence at the initiation of the SVP proceedings; and, failing to raise viable defenses to the SVP allegations; and,

cc.     Failing to adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys.

270.     Specifically, as pertinent to Mr. Williams' case, the aforementioned practices, customs, policies and procedures collectively and individually caused the delay in Mr. Williams' case and were the moving force behind his Due Process rights being violated. Specifically, such practices, customs, policies and procedures resulted in Mr. Williams' case not coming to trial as follows:

a.     As alleged in paragraph 41(p) and paragraph 150 above, DPD3 appeared on February 28, 2019, and informed the court that she could not bring a Litmon/Vasquez motion as ordered by the court because she was "restrained" from filing such a motion. The court noted that the Public Defender's policy could not override their ethical duty to Mr. Williams. Despite the court's order, DPD3, pursuant to her office's policy, was barred from filing a Litmon/Vasquez motion. The practice, custom, policy and procedure of County of Los Angeles and defendant Public Defender's Office of preventing and restraining the attorneys in its SVP Unit from filing Litmon-Vasquez motions to dismiss, writs or other legal challenges of the SVP petitions filed against SVP clients/detainees on constitutional grounds because they are counter to the interests of the Public Defender's Office and would expose the systemic dysfunctions present in the Public Defender's Office and the fact that the Public Defender's Office had violated the constitutional rights of their SVP client/detainees caused and was the moving force behind the violation of

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Mr. Williams' due process rights to a timely trial.  As alleged above, Mr. Williams' conflict counsel, subsequent to defendants' declaring a conflict and being removed as plaintiff's SVP counsel, actually did file such a *Litmon-Vasquez* motion to dismiss.  As such, it was legally viable and was a defense strategy that was appropriate for use in Mr. Williams' case to dismiss the petition filed against him.  As noted above, courts in *Vasquez, DeCasas*, and *Frazier* had all found defendant County and its defendant Public Defender's Office to be systemically dysfunctional in its SVP public defender defense system, and that such systemic dysfunction caused the violations of the due process rights of their SVP clients, such as Mr. Williams.  Mr. Williams stood in the same position as the defendants in *Vasquez*, *DeCasas* and *Frazier*.  These courts have found that *Litmon-Vasquez* motions that successfully allege that said dysfunction caused the delay in the timely resolution of their SVP cases will be granted, the SVP petitions would be dismissed and the SVP detainee clients would be immediately released.  Had a *Litmon-Vasquez* motion in Mr. Williams' case been brought in a timely manner by defendants and their deputy public defenders, Mr. Williams would have either been successful and been released or been immediately brought to trial as said *Litmon-Vasquez* motion would have trigged the court to set the matter for trial and not allow any future continuances without Mr. Williams' express agreement.  But for this policy and practice, DPD3 or other deputy public defenders before her would have filed the motion to dismiss, the motion would have been granted and Mr. Williams would have been released from custody.

b. Mr. Williams was represented by the PD's office at his first probable cause hearing in 2008, and also for his second probable cause hearing in

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

2015.  At the time, it was known by the PD's office that Mr. Williams'
juvenile criminal records formed the basis for the predicate crimes
allegations against him.   Such records were inadmissible in such
proceedings.  In 2021, the improper use of these records would
ultimately lead to the dismissal of the SVP proceedings against Mr.
Williams.  The PD's office, however, failed to challenge this evidence
during the probable cause proceedings.  The court in Mr. Williams'
underlying SVP case found that the District Attorney's Office
improperly obtained and used his juvenile records as the basis of filing
the petition against him.  Had the PD's office challenged the use of his
juvenile records by defendants' experts at the probable cause stage, they
would have been successful and Mr. Williams' petition would have been
resolved early in his case as it would have been fatally damaging to the
District Attorney's petition against him.  This was proven by the fact that
when the court found that his juvenile records were used improperly and
could not be used to support the SVP petition against him, the District
Attorney's Office dismissed his petition because it could not be
successful in a trial against Mr. Williams without the necessary
underlying predicate offenses that were established through the use of
the juvenile records.  As such, the County of Los Angeles's and
defendant Public Defender's Office's practice of waiving or failing to
challenge evidence at probable cause at the initiation of SVP
proceedings and at probable cause proceedings resulted in the
prolonging of Mr. Williams SVP proceedings and caused and was the
moving force behind the violation of Mr. Williams' due process rights to
a timely trial.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.   As noted in the paragraph above, the PD's office failed to investigate and present a viable defense to the SVP proceedings against Mr. Williams.  As such, defendant County of Los Angeles's and defendant Public Defender's Office's practice of failing to investigate all meaningful defenses to SVP proceedings caused and was the moving force behind the violation of Mr. Williams' due process rights to a timely trial.  But for this policy and practice, it would have been discovered that the prosecution was proceeding against Mr. Williams based on inadmissible evidence, specifically his juvenile criminal record, and he would not have been held as an SVP detainee or otherwise forced to undergo detention as an SVP detainee.

d.   As noted above in paragraph 270 b., the PD's office allowed the improper use of Mr. Williams' juvenile criminal records by the prosecution in the SVP proceedings without challenging this for 13 years.   As such, defendant County of Los Angeles's and defendant Public Defender's Office's practice of failing to timely challenge the use of juvenile records and criminal history by the prosecution and prosecution's experts caused and was the moving force behind the violation of Mr. Williams' due process rights to a timely trial and caused him to be wrongfully detained for 13 years. But for this policy and practice, it would have been discovered that the prosecution was proceeding against Mr. Williams based on inadmissible evidence, specifically his juvenile criminal record, and he would not have been held as an SVP detainee or otherwise forced to undergo detention as an SVP detainee.

e.   DPD1, DPD1 and DPD3 regularly failed to inform Mr. Williams of the status of his case, of any strategy to move the case forward and,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    eventually, of the viability of a Litmon/Vasquez motion.  Moreover, said

2    deputy public defenders also misrepresented the status of Mr. Williams'

3    case so as to secure a written waiver in 2010 (which Mr. Williams

4    promptly revoked).  Because of this, Mr. Williams was kept unaware of

5    the status of his case and the likelihood of success in his case.   Had he

6    been properly informed and kept apprised of the strategies to be

7    employed in his case, he would have insisted on a prompt trial and

8    would not have waived his rights at all.  As such, the court would have

9    had no recourse other than to set his case for immediate trial and his case

10   would have resolved.  Accordingly, Defendant County of Los Angeles's

11   and defendant Public Defender's Office's practice and custom of failing

12   to communicate to SVP client/detainees the status of their cases, the

13   strategies which were to be employed in defending their case, and the

14   likelihood of success of their efforts caused and were the moving force

15   behind the violation of Mr. Williams' due process rights to a timely trial;

16   f.    DPD1, DPD2 and DPD3 failed to obtain consent from Mr. Williams to

17   continue hearings in his SVP case.  In fact, Mr. Williams complained to

18   his deputy public defenders that hearings and proceedings were

19   continued without his consent.   These hearings and proceedings directly

20   related to whether his matter would be set for trial.  Because these

21   hearings and proceedings were continued, trial in his case was not set

22   and he did not receive a timely trial.  Had these hearings and

23   proceedings not been continued, Mr. Williams' case would have come to

24   trial promptly and his due process rights to timely trial would have been

25   protected.  As such, defendant County of Los Angeles's and defendant

26   Public Defender's Office's practice, policy, custom and/or procedure of

27   failing to obtain consent from SVP client/detainees to continue hearing

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    dates, trials dates, as well as other deadlines which were in their control

2    caused and was the moving force behind the violation of Mr. Williams'

3    due process rights to a timely trial.

4    g.   As outlined above in the Statement of Facts, DPD1, DPD2 and DPD3

5        repeatedly waived Mr. Williams' appearance at hearings without his

6        consent.  In fact, Mr. Williams complained to his deputy public

7        defenders that he was being manipulated into waiving his appearance at

8        hearings or of not being informed of hearings.   These hearings and

9        proceedings directly related to whether his matter would be set for trial.

10       Because these hearings and proceedings were continued, trial in his case

11       was not scheduled and he did not receive a timely trial.  Had Mr.

12       Williams' appearance at these various hearings not been waived, he

13       would have insisted on a prompt and timely trial.  As such, Mr.

14       Williams' case would have come to trial promptly and his due process

15       rights to timely trial would have been protected.  As such, defendant

16       County of Los Angeles's and defendant Public Defender's Office's

17       practice, policy, custom and/or procedure of waiving of SVP

18       client/detainees' appearance at hearings without securing their authority

19       to do so and/or convincing SVP client/detainees to waive their

20       appearance at hearings against their best interests caused and was the

21       moving force behind the violation of Mr. Williams' due process rights to

22       a timely trial.

23   h.   As presented above in the Statement of Facts, status conference dates,

24       pretrial conference dates and trial dates were continued by DPD1,

25       DPD2, DPD3 and other representatives from the Public Defenders'

26       Office without Mr. Williams' consent.  These hearings and proceedings

27       directly related to whether his matter would be set for trial if it had not

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

already been set for trial.  Because these hearings and proceedings were continued, trial in his case was not set and he did not receive a timely trial. Had these hearings and proceedings gone forward in a timely fashion, Mr. Williams' SVP case would have come to trial in a timely fashion.  Defendant DPD1, DPD2 and DPD3 failed to obtain consent from Mr. Williams to continue hearings in his SVP case.  In fact, Mr. Williams complained to his deputy public defenders that hearings and proceedings were continued without his consent.   Had these hearings and proceedings not been continued, Mr. Williams' case would have come to trial promptly and his due process rights to timely trial would have been protected.  As such, defendant County of Los Angeles's and defendant Public Defender's Office's practice, policy, custom and/or procedure of continuing trial dates and other related dates without client consent and without clients waiving their rights to speedy trials and/or convincing SVP client/detainees to waive time for trial against their best interests, caused and was the moving force behind the violation of Mr. Williams' due process rights to a timely trial.

i.  As presented above in the Statement of Facts, status conference dates, pretrial conference dates, trial dates and other hearings were continued by DPD1, DPD2, DPD3 and other representatives from the Public Defenders' Office and/or by the Los Angeles County District Attorney's Office without Mr. Williams consent.  These hearings and proceedings directly related to whether his matter would be set for trial if it hadn't already been set for trial.  Because these hearings and proceedings were continued, trial in his case was not set and he did not receive a timely trial.  Had these hearings and proceedings gone forward in a timely fashion, Mr. Williams' SVP case would have come to trial in a timely

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

fashion.   Defendant County of Los Angeles's and defendant Public Defender's Office's practice, policy, custom and/or procedure of agreeing to repeated continuances sought by the prosecution and/or seeking continuances without their clients' consent caused and was the moving force behind the violation of Mr. Williams' due process rights to a timely trial.

j.   As presented above in the Statement of Facts, Mr. Williams regularly requested that his case be brought to trial.  These requests were ignored by DPD1, DPD2, DPD3 and other representatives from the PD's office.  Had these requests not been ignored, Mr. Williams' case would have been brought to trial.   As such,  Defendant County of Los Angeles's and defendant Public Defender's Office's practice, policy, custom and/or procedure of ignoring requests from SVP clients/detainees to bring their case to trial promptly was the cause and moving force behind the violation of Mr. Williams' due process rights to a timely trial;

k.   As presented above in the Statement of Facts, the Public Defender's Office failed to implement reasonable deadlines for the processing of SVP cases.  Moreover, there was a custom and practice in place not to establish reasonable deadlines for the processing of SVP cases and to seek regular continuances of hearing dates.  These hearings and proceedings directly related to whether his matter would be set for trial if it hadn't already been set for trial.  Because these hearings and proceedings were repeatedly continued, trial in his case was not set and he did not receive a timely trial.  There were no reasonable deadlines established for hiring experts to give expert opinion at trial, for filing law and motion briefs to challenge the petition filed against him, including to challenge the juvenile records improperly used against him and to file motions to dismiss, and for investigating, and proffering, all defenses in

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

fact and law to defend against the petition.  Because there were no reasonable deadlines set, there were no experts hired, and motions to dismiss his case, defend his case and to force his case to trial were either never filed or were delayed by many years. Had there been reasonable deadlines in place for the processing of Mr. Williams' case, his case would have come to trial in a timely fashion.  As such, Defendant County of Los Angeles's and defendant Public Defender's Office's practice, policy, custom and/or procedure of failing to meet reasonable deadlines in SVP cases was the cause and moving force of the violation of Mr. Williams' due process rights to a timely trial.

l.      As noted above in the Statement of Facts, Mr. Williams' attorneys from the Public Defender's Officer failed to timely secure experts in his case and failed to ensure that the experts were prepared and had completed their work in a timely fashion.  Because of this failure, Mr. Williams' case could not proceed to trial in a timely fashion.  Mr. Williams could not proceed to trial without a proper defense, and subject matter experts, such as psychologists, are a necessary to meaningfully defend against the SVP petition filed against him.  Without such subject matter experts to testify on his behalf, Mr. Williams could not present a meaningful and proper defense and, therefore, could not go to trial.  As such, Defendant County of Los Angeles's and defendant Public Defender's Office's practice, policy, custom and/or procedure of failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion was the cause and moving force of the violation of Mr. Williams' due process rights to a timely trial;

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

m.   The expert reports for the prosecution were valid for one year.  After that, the reports would lapse and would have to be re-done pursuant to statute.  One could only be found to be SVP based on a current expert opinion/diagnosis.  As presented above in the Statement of Facts, DPD1, DPD2 and DPD3 were aware that they had to bring Mr. Williams' case to trial within one year of the prosecution's expert report date.  Because of the various continuances of hearing dates and trial dates, DPD1, DPD2 and DPD3 failed to get Mr. Williams' case to trial within the one year of the prosecution's expert reports such that Mr. Williams case had to be further continued.   Had defendants' and their deputy public defenders not had a policy of allowing expert reports to lapse or otherwise go stale, there would be no need for the court to order new state evaluations of Mr. Williams and, as such, the parties would be prepared to go to trial.  Because the District Attorney's expert reports lapsed and/or went stale, the court ordered new evaluations that would take several months, if not years, to be conducted in addition to the additional months necessary for the expert to draft his/her report.  Such new reports, therefore, caused Mr. Williams' SVP case to not be set for trial.  Accordingly, defendant County of Los Angeles's and defendant Public Defender's Office's practice, policy, custom and/or procedure of allowing experts' reports to lapse or otherwise go stale was the cause and moving force of the violation of Mr. Williams' due process rights to a timely trial;

n.   Because of the various continuances of hearing dates, because of the substitutions of trial counsel and the resulting delays, and because of other delays in the proceedings caused by DPD1, DPD2, DPD3 and the Public Defender's Office, Mr. Williams accrued the right to proceed

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

with a motion to dismiss his case based on the failings of his counsel as allowed by *People v. Litmon* (I and II).   Mr. Williams' attorneys from the Public Defender's Office concealed from Mr. Williams that he had the right to proceed with such a motion.  Had they disclosed this in a timely manner, Mr. Williams would have moved for new counsel so as to proceed with a *Litmon* motion.  Given the great delay in his proceedings and given Mr. Williams constant insistence his case proceeding to trial, a *Litmon* motion would have been granted.  As alleged above, Mr. Williams' conflict counsel, subsequent to defendants' declaring a conflict and being removed as plaintiff's SVP counsel, actually did file such a *Litmon-Vasquez* motion to dismiss.  As such, it was legally viable and was a defense strategy that was appropriate for use in Mr. Williams' case to dismiss the petition filed against him.  As noted above, courts in *Vasquez, DeCasas*, and *Frazier* have all found defendant County and its defendant Public Defender's Office to be systemically dysfunctional in its SVP public defender defense system, and that such systemic dysfunction caused the violations of the due process rights of their SVP clients, such as Mr. Williams.  These courts have found that *Litmon-Vasquez* motions that successfully allege that said dysfunction caused the delay in the timely resolution of their SVP cases will be granted, the SVP petitions would be dismissed and the SVP detainee clients would be immediately released.  Had Mr. Williams known he had a viable *Litmon-Vasquez* motion and been able to move for new counsel to file said motion, a *Litmon-Vasquez* motion in Mr. Williams' case would have been brought in a timely manner by defendants and their deputy public defenders, Mr. Williams would have either been successful and been released or been immediately brought to

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   trial as said *Litmon-Vasquez* motion would have trigged the court to set

2   the matter for trial and not allow any future continuances without Mr.

3   Williams' express agreement. Accordingly, defendant County of Los

4   Angeles's and defendant Public Defender's Office's practice, policy,

5   custom and/or procedure of failing to inform their clients of conflicts of

6   interests based on their failure to bring SVP cases to trial in timely and

7   constitutional fashion, failing to inform clients of their right to bring a

8   motion to dismiss their case under *People v. Litmon* (I and II) and in

9   *People v. Vasquez,* and failing to inform the court of conflicts of interest

10   were the causes and moving forces of the violation of Mr. Williams' due

11   process rights to a timely trial;

12   o.   As presented in the Statement of Facts herein above, the Public

13   Defender's Office allowed Mr. Williams' case to sit idle from 2007 until

14   2019 when, in 2019, the PD's office began a collateral attack on the

15   prosecution's SVP case through proceedings to exclude Mr. Williams'

16   juvenile criminal records.   This attack could have, and should have,

17   been initiated during the probable cause proceedings.  Moreover, the

18   Public Defenders' Office allowed the improper use of Mr. Williams'

19   juvenile criminal records after they were statutorily required to be

20   destroyed in 2012.   This, along with a history of non-action,

21   substitutions of deputy public defenders as well as to delays presented in

22   paragraphs 270 a. through 270 p., caused Mr. Williams' SVP case to sit

23   idle without meaningful progress toward trial being made.  As such,

24   defendant County of Los Angeles's and defendant Public Defender's

25   Office's practice, policy, custom and/or procedure of allowing SVP

26   cases to sit idle for years without meaningful progress was the cause and

27

28

126

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    moving force of the violation of Mr. Williams' due process rights to a

2    timely trial;

3    p.   As early as 2006, the Public Defender's Office had an overwhelmingly

4    large backlog of SVP cases such that the PD's office could not

5    reasonably proceed with their SVP caseload and had to seek judicial

6    relief.  In 2006, the PD's office asked the court to be relieved in 64 SVP

7    cases so as to deal with the backlog of SVP cases.  The court could not

8    relieve the PD's office because the court could not find private counsel

9    or other counsel to represent the 64 SVP cases that the PD's office

10   sought relief on.  As such, in 2007 the PD's office was, per its own

11   admission, unable to proceed with its SVP caseload due to a large

12   backlog of SVP cases.   Accepting additional SVP cases, in light of the

13   backlog of SVP cases, would ensure that any new case would not be

14   brought to trial in a timely manner because of the pre-existing backlog of

15   SVP cases.  As such, the PD's office was obligated under the State Bar

16   Indigent Defense Guidelines to declare themselves unavailable to accept

17   further cases (CA Penal Code, e section 987.2, subdivisions (d) and (e)).

18   Because of its policy and custom to not declare unavailability and to

19   ignore State Bar guidelines for the provision of indigent legal defense

20   services, specifically failing to monitor the caseloads of the Public

21   Defender attorneys, the PD's office accepted Mr. Williams SVP case

22   knowing that they could not meaningfully represent Mr. Williams due to

23   the backlog of SVP cases.  Due to this backlog, Mr. Williams' SVP case

24   remained idle until 2019. As such, these policies, customs and policies

25   were the cause and moving force of the violation of Mr. Williams'

26   process rights to a timely trial.

27

28

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

271.   The deliberate indifference to the rights of the SVP clients represented by the PD's Office was manifested in the following cases:

    a.    The 64 cases that were the subject of the 2007 memorandum of understanding entered into by the PD's Office, the Superior Court and the District Attorney's Office.

    b.    The SVP matter of People v. Gaspar Zavala;

    c.    The SVP matter of People v. George Vasquez;

    d.    The SVP matter of People v. Rodrigo DeCasas;

    e.    The SVP matter of People v. Jason Taylor;

    f.    The SVP matter of People v. Darryell Frazier; and,

    g.    The SVP matter of People v. Barry Bartlett;

272.   Deliberate indifference to the civil rights of SVP detainees such as Mr. Williams was evidenced by said defendants' ignoring the long delays in the bringing of SVP cases to trial and the long pre-trial detentions suffered by SVP clients.

273.   Further deliberate indifference by these defendants was evidenced by the following acts and omissions:

    a.    Failing to file *Litmon-Vasquez* motions to dismiss, writs or other legal challenges of the SVP petitions filed against SVP clients/detainees on constitutional grounds because they are counter to the interests of the Public Defender's Office and would expose the systemic dysfunctions present in the Public Defender's Office and the fact that the Public Defender's Office had violated the constitutional rights of their SVP client/detainees;

    b.    Failing to implement policies and procedures to advance or otherwise expedite the bringing of the SVP cases to trial,

    c.    Failing to prioritize resources to the oldest SVP cases to ensure they would get to trial in an expedited fashion,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

d.   Failing to discipline deputy public defenders who repeatedly failed to bring old SVP cases to trial,

e.   Failing to institute tighter controls over supervisors in the SVP Unit to ensure that they managed their subordinates in a fashion that ensured that the older SVP cases would get to trial promptly,

f.   Failing to impose time limits for the bringing of SVP cases to trial,

g.   Failing to declare conflicts or to declare "unavailability" in old SVP cases so as to ensure that the courts could appoint private counsel or counsel from the alternate public defender's office to bring SVP cases to trial,

h.   Failing to declare conflicts or declare "unavailability" in those older SVP cases that were subject to a *Litmon* motion so as to permit the court to appoint private counsel to represent those detainees who had valid grounds to bring such motions, and

i.   Failing to train attorneys coming into the SVP Unit.

274.   The foregoing acts, omissions, and systemic deficiencies are and were customs, practices, policies and procedures of defendant County of Los Angeles and of defendant Public Defender's Office and by ratifying such, these defendants permitted and encouraged attorneys in the Public Defender's Office to delay in bringing SVP cases to trial in a timely fashion.  This caused, permitted and/or allowed under official sanction the attorneys of the Public Defender's Office to believe that the long delays in bringing SVP cases to trial would not be objectively, thoroughly and/or meaningfully investigated and that no negative consequences would befall them, all with the foreseeable result that said attorneys would greatly delay in bringing SVP cases to trial and thereby violate the civil rights of the SVP detainees in their charge.

FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

275.   As a direct and proximate result of the aforementioned acts alleged herein, Mr. Williams was detained for more than 13 years in violation of his due process rights as alleged in the first claim for relief which caused him serious and permanent injuries and have physically, psychologically, and emotionally impaired him permanently.  The PD's office failed to get Mr. Williams case to trial in a timely fashion.   When urged by the court to file a motion to dismiss under *Litmon* because of the great damage already done to Mr. Williams, the PD's office refused to do so. By that point, however, the damage had already been done. Mr. Williams had already undergone countless years of unconstitutional delay.

276.   As a result of the above customs, practices, policies and procedures of defendant County of Los Angeles and of defendant Public Defender's Office, Mr. Williams was damaged and injured as alleged above by being made to endure a wrongful 13-year pre-trial detention.

## VIII.

## PRAYER

Wherefore, plaintiff Corey Williams demands the following relief, against all the defendants with respect each of the claims for relief above:

a.      Compensatory general and special damages in an amount in accordance with proof;

b.      Punitive and exemplary damages, against defendants Ricardo Garcia, Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, Ruben Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 in an amount sufficient to deter and to make an example of these defendants;

c.      Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. §1988;

d.      Costs of suit necessarily incurred herein; and,

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

e.      Such further relief as the Court deems just or proper.

Dated: July 18, 2023                    CASILLAS & ASSOCIATES

By:  _/s/   Arnoldo Casillas_
ARNOLDO CASILLAS
DANIEL W. GILLETTE
Attorneys for Plaintiff
COREY WILLIAMS

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

# DEMAND FOR JURY TRIAL

COMES NOW Plaintiff COREY WILLIAMS and respectfully demands that the present matter be set for a jury trial.


Dated: July 18, 2023                    CASILLAS & ASSOCIATES

                                        By:  /s/  Arnoldo Casillas
                                        ARNOLDO CASILLAS
                                        DANIEL W. GILLETTE
                                        Attorneys for Plaintiff
                                        COREY WILLIAMS

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

# EXHIBIT 1

<u>Memorandum of Understanding Documenting Agreed Upon Changes to the October 11, 2006 Stipulation To Implementation of "Jessica's Law" or Legislation</u>

The following memorializes the agreement reached concerning changes to the October 11, 2006 Stipulation to Implementation of "Jessica's Law" or Legislation:

1. In direct response to the ballot initiative known as "Jessica's Law" and the related urgency legislation, on October 11, 2006, representatives from the Los Angeles County Public Defender, the Los Angeles County District Attorney and the Los Angeles Superior Court entered into a written stipulation regarding the applicable length of commitment for individuals represented by the Los Angeles County Public Defender for whom Sexually Violent Predator (SVP) petitions were pending at the effective date of the initiative or legislation. For those individuals, it was agreed that the District Attorney would seek a two year rather than an indeterminate commitment. The stipulation was signed by the Supervising Judge of the Los Angeles Superior Court Criminal Division and the Public Defender and District Attorney Head Deputies.

2. The October 11, 2006 stipulation contained a 24 month limit by which time the pending SVP petitions would need to be tried in order to benefit from the two year commitment term provided by the stipulation. This limitation is contained in the paragraph entitled "24 Month Time Limit".

3. Following the October 11, 2006 stipulation, the Public Defender's Office determined that it lacked the necessary resources to try all its pending SVP cases during the required 24 months provided for in order for the affected individuals to benefit from the two year commitment term. This would necessitate the Public Defender choosing which clients would go to trial before the time limit was reached and which would not, presenting ethical and liability issues. Because of this, the Public Defender sought to be relieved on 64 cases.

4. After several months of effort, the Superior Court determined that it could not find an adequate number of private attorneys willing and qualified to assume representation of the SVP clients that the Public Defender was unable to handle. Because of this lack of available and competent private attorneys, an executive manager in the District Attorney's Office offered to withdraw the 24 month time limit in exchange for the Public Defender's maintaining representation of the 64 clients. This would ensure that these SVP clients would have competent representation and that they would not be deprived of due process because of a lack of County, attorney and judicial resources.

5. Accordingly, in May, 2007, executive managers from the District Attorney and Public Defender agreed to rescind the section entitled "24 Month Time Limit" of the October 11, 2006 Stipulation to Implementing Jessica's Law or Legislation in exchange for the Public Defender's Office continuing representation of every one of its SVP clients. The County agreed to provide the Public Defender's Office with additional resources to enable it to handle the increased workload. Representatives of the Los Angeles Superior Court were present at the time of the agreement eliminating the 24 month time limit and were in acquiescence. All other sections of the October 11, 2006 stipulation remained the same.

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

6. In reliance on the May, 2007 agreement to delete the 24 month time limit, the Los Angeles County Public Defender's Office maintained representation of every one of its original SVP clients.

Jane Blissert
Representative--District Attorney

Michael Suzuki
Representative--Public Defender

The Court accepts the stipulation.

Peter Espinoza
Judge, Los Angeles Superior Court

**FOURTH AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**